STATE of Wisconsin, Plaintiff-Respondent,†

v.

Ondra BOND, Defendant-Appellant.

Court of Appeals

*No. 98–3139–CR. Oral argument April 25, 2000.—Decided
May 30, 2000.*

## 2000 WI App 118

(Also reported in 614 N.W.2d 552.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William S. Coleman, Jr.*, assistant state public defender, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Marguerite M. Moeller,* assistant state public defender.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. Ondra Bond appeals from the judgment of conviction for intimidation of a witness, party to a crime, habitual criminality, following a jury trial, and from the order denying his postconviction motion. He argues that the trial court erred in admitting evidence of his statement in response to a police officer's remark to him, while in custody and before being advised of his *Miranda*[1] rights. Bond contends that, under *Rhode Island v. Innis*, 446 U.S. 291 (1980), and *State v. Cunningham*, 144 Wis. 2d 272, 423 N.W.2d 862 (1988), the officer's remark was the functional equivalent of interrogation and, therefore, his incriminating response should have been suppressed. Bond is correct and, accordingly, we reverse.[2]

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Bond also argues that he was denied due process of law when, at jury selection, he was allowed only three peremptory challenges. Alternatively, he argues that counsel's failure to object to being allowed only three peremptory challenges constituted ineffective assistance of counsel. The State explains: "The 'Jury Panel Roster' shows that the prosecution and defense each

## I. BACKGROUND

¶ 2. The facts relevant to resolution of this appeal are undisputed. Bond's two brothers and a third man were scheduled for a preliminary hearing on February 21, 1997, on drug charges flowing from an undercover investigation. Three of the officers involved in the investigation were Ronald Taylor (known as "Stoney" in the undercover work), Raymond Taylor (known as "Ray-Ray" in the undercover work),[3] and Detective Rayford Weston.

¶ 3. Two days before the preliminary hearing, Detective Weston received two threatening calls on the FBI-issued cell phone that Officer Taylor and Officer Taylor had been using exclusively for their undercover

---

exercised three peremptory strikes rather than the four to which the parties were entitled under [WIS. STAT. § 972.03]. Unfortunately, the record does not reflect why this occurred." At oral argument, however, Bond's counsel tacitly acknowledged that the supreme court's recent decision in *State v. Erickson*, 227 Wis. 2d 758, 596 N.W.2d 749 (1999), *cert. denied*, 120 S. Ct. 987 (2000), establishes that, because trial counsel did not object, only Bond's ineffective assistance of counsel theory is viable and, because no prejudice can be shown, that theory fails. As the supreme court in *Erickson* concluded:

> [I]n light of the failure of [the defendant's] attorney to object and preserve for appeal the deprivation of . . . peremptory strikes, the proper framework for analyzing his claim is that of ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish prejudice. Since we decline to presume prejudice where there is a denial of an equal number of peremptory strikes to both the defense and the prosecution and since [the defendant] has failed to show actual prejudice, the claim for ineffective assistance of counsel must fail.

*Id.* at 777.

[3] Officer Taylor and Officer Taylor had no familial relationship to each other.

investigation. Seven months later, answering the pros-
ecutor's questions at Bond's trial, Detective Weston
testified:

> A: Sometimes drug dealers call whenever they
> want to. It's not a science, and they don't call when
> they normally should, they call whenever it's time
> to call. The phone rang at 11:20 [p.m.]. I answered
> the phone.

> Q: Now, when you answered the phone in your
> undercover capacity and [on] an undercover F.B.I.
> . . . phone, I am sure you [didn't] answer the phone[,
> "]Detective Weston.["]

> A: No, I just say yeah. That's the way I answer all
> phones. I'm pretty rude.

> Q: Specifically, you don't want to give away your
> identity when you answer that phone?

> A: Exactly.

> Q: And you say some nondescript yeah. And what
> kind of answer [did] you get from the caller?

> A: The caller said is this Ray-Ray. I said who's
> calling, and we had . . . a brief conversation.

> Q: Did the caller ever identify himself?

> A: No, not at all.

> Q: When this caller called, was there any recogni-
> tion of his voice on this first call at 11:20 p.m.?

> A: No.

> Q: And at first did it just sound like somebody
> calling for Ray-Ray?

> A: Yes. I thought it was another drug dealer . . .
> trying to get ahold of . . . Ray or Ron Taylor.

Q: After a short time in this first call, were things said that you took special note of and later put into a report?

A: Yes.

Q: And what was that and why did you put it into a report?

A: Well, I perceived them as threats. I've worked narcotics a long time. . . . I've been a police officer long enough, and even without being a police officer, I've heard threats. I know what a threat is, and I interpreted what I heard over the phone as . . . a threat to kill a person they thought was a drug dealer or a witness in court.

Q: Now, going specifically to the first phone call, what was the first indication you had that this was becoming threatening?

A: . . . [T]he caller said I know who you are and . . . I know where you live. Don't be in court on Friday.

Q: Do you know whether or not the caller was assuming that you were Ray-Ray or had you already said that you're not Ray-Ray?

A: The caller was assuming that I was Ray-Ray. That was my interpretation, yes.

Q: Because you didn't say let me get him, you said who is this?

A: I said who is this, yes.

Q: Okay. And was there ever anything said about snitching on the part of this caller?

A: Yeah. The caller said I know you snitched. Don't be in court on Friday, things of that nature, yes.

Q: Based upon your experience in working in the drug area, what is normally meant by the word snitch?

A: Working as an informant or somebody that helps the police with information.

Q: That wouldn't be a normal term that somebody would use to refer to an undercover officer. Would it?

A: No, it would not be.

. . . .

Q: And there [were] some references to where somebody other than you lived?

A: Yes. He said I know where your parents live. . . . I know who you are. Don't be in court on Friday, things of that nature.

. . . .

Q: . . . [T]his was the only Friday drug case that you had going at that time?

A: That's correct.

Q: Can you estimate about how long this first telephone call lasted?

A: It didn't last very long. It was probably less—I don't know. I would be guessing, but a minute or so. I didn't time it.

Q: And then do you know how that call ended? Did one of the two of you hang up?

A: Yeah. I just hung up, and the phone rang about 3 minutes later. I recognized the same voice again.

Q: And are you sure it was the same caller 3 minutes later?

A: I'm positive it was the same person.

. . . .

639

Q: What sorts of comments were made during the second call?

A: Pretty much of the same tone. I know who you are. What is up with your boy Ston[e]y. Ston[e]y is the name that Ronald Taylor was using during this undercover investigation.

Q: Now, who first mentioned the name Ston[e]y, you or the caller?

A: The caller. It [sic] didn't give out any information at all. That's typical. I don't try to obtain information. I done [sic] give it.

Q: Was there again reference made specifically to the Friday court appearance?

A: Yes. Don't be in court on Friday. I know where your family lives. . . . [H]e made a statement to the effect why you snitching to the white man and things of that nature.

Q: Okay. Were there any specific threats of violence made against either the person he thought was Ray-Ray or against Ston[e]y?

A: Yes. He threatened to kill Ston[e]y. Don't be in court on Friday, I'll kill you.

Q: Did you ever ask the caller to identify himself?

A: I asked several times. The caller wouldn't say. The caller said you know who I am. I'm the man behind the man, and things—cryptic things like that the caller would say.

Q: During the course of this whole couple month long drug investigation, had you heard anybody else use that phraseology, I'm the man behind the man?

A: No, not at all.

Q: Did you find that to be somewhat distinctive or unusual?

640

A: Yeah, I thought it was distinctive and unusual, sure.

Q: Did you put that into a written report after receiving this call?

A: Yes, I did.

¶ 4. Two days after receiving the threatening calls, Detective Weston, Officer Taylor, and Officer Taylor, all wearing plain clothes to maintain their undercover identities, were at the preliminary hearing court. Detective Weston observed Bond sitting at the defense table in the courtroom and also milling around with others in the lobby outside the courtroom. In the lobby, Detective Weston saw Bond and Officer Ronald Taylor in conversation and, Detective Weston testified at Bond's trial, when he heard Bond's voice he "recognized it right away" as the person who had made the threatening calls. Detective Weston also testified:

> When I heard the voice initially [in the lobby conversation with Officer Ronald Taylor], I was sure that was the voice, but I wanted to give him the benefit of the doubt, and I stood around, and I wanted to hear Mr. Bond talk some more just to reaffirm the voice, and I was positive it was the voice I heard.

After recognizing Bond's voice, Detective Weston notified Officer Taylor and Officer Taylor that Bond was the person who had made the calls. Bond was then arrested. He did not resist but, Detective Weston testified, "some of the individuals that he was with came over and they got loud . . . and started causing a disturbance in . . . the lobby of the preliminary court." Responding to the prosecutor's questions at Bond's trial, Detective Weston further explained:

Q: This arrest took place right out in the public access corridor?

A: That's correct.

Q: And did Mr. Bond ask anything as you advised him or Ston[e]y advised him that he was under arrest?

A: He kept asking, well, why am I under arrest. And we kept telling him, we will tell you in a few minutes. We didn't want to blurt it out in front of everybody. He kept asking me what am I here for, why are you arresting me, where are you going, things of that nature.

Q: Did you begin to walk him toward the elevator?

A: We walked him toward an elevator, and actually ended up walking him from . . . the Criminal Justice Facility [where the preliminary court was located] to the Milwaukee Police Department, so we walked him down State Street, which is about a block or so.

Q: And this is before the actual case is called for preliminary hearing?

A: That's correct.

Q: And did anybody respond in any way to Ondra Bond's question about why am I under arrest?

A: Sure. He kept asking why he was under arrest, and Officer Taylor I believe—Ron Taylor told him that you're under arrest and I'll tell you what it's for in a minute. And Mr. Bond said, oh, you're the man, and Taylor real quickly said, no, I'm the man behind the man, and he says, oh, that is what this is about.

¶ 5.  Officer Ronald Taylor also testified at Bond's trial, clarifying that after Bond said, "You're the man," it was Officer Raymond Taylor who responded, "No,

you're the man behind the man," and that Bond immediately replied, "Ah, so that's what this is about."[4] Additionally, under cross-examination, when asked the meaning of the phrase "the man behind the man," Officer Ronald Taylor testified:

> A: [T]he man behind the man . . . would possibly be . . . I'm the man who does the dirty work, I'm the muscle; it could mean . . . that you are humbling yourself, no, I'm not the man, you the man. I'm just the man behind the man; it could mean . . . either or.

> Q: Okay. Which one of those meanings was the one that you understood . . . Ray Taylor to mean when he said to Mr. Bond that, I'm the man behind the man? If it wasn't any one of those, that's okay, too. But did you understand it to have any one of

---

[4] The balance of the trial testimony establishes that the critical exchange was between Bond and Officer Raymond Taylor. Neither party suggests that any of the slight distinctions in the several testimonial paraphrasings of their conversation makes any difference. For clarity and consistency in this decision, we will use the following version:

Bond: You're the man.

Officer Raymond Taylor: No, you're the man behind the man.

Bond: Ah, so that's what this is about.

Officer Ronald Taylor's testimony also clarified the location of this exchange. He explained that he, Officer Raymond Taylor, Detective Weston, and Bond traveled down the elevator of the Criminal Justice Facility, exited onto Ninth Street, walked north to State Street, and were walking east on State Street toward the Police Administration Building when, in front of the Safety Building, Officer Raymond Taylor and Bond had their conversation. Thus, contrary to the assertion in the dissenting opinion, Officer Taylor's comment did not come "in the midst of a highly volatile situation." Dissent at ¶ 37.

those particular meanings when you heard him say it?

A:   When . . . Mr. Bond said . . . you're the man, and [Raymond] Taylor said, no, I'm the man behind the man?

Q:   Yeah.

A:   *I think that statement was—and this is just my opinion—was designed to—to elicit a response from Mr. Bond.*

(Emphasis added.)

¶ 6.   At Bond's trial, as soon as the prosecutor, in his opening statement, referred to Bond's statements upon being arrested, defense counsel interrupted: "Excuse me. I object. I believe this is post-custody/pre-Miranda that he's commenting on. He's never indicated he was going to use any of that in this case and I object and move that it be stricken." The trial court, however, did not rule on counsel's objection, merely stating: "Just move on. Let's go ahead." When defense counsel continued to object to the prosecutor's opening statement and its references to Bond's questions "like why are you arresting me, what's going on," the trial court again did not rule but "noted [the objection] for the record." The prosecutor continued, specifying that "when Officer Taylor tells Ondra Bond you're the man behind the man, Ondra Bond responds . . . oh, that's what this is all about."

¶ 7.   The record confirms that the prosecutor had failed to advise defense counsel or the trial court of the State's intention to use Bond's statement, made in response to Officer Raymond Taylor's statement, in its case in chief. Prior to trial, the trial court neither held a

*Miranda-Goodchild* hearing[5] nor made any record of whether Bond would have challenged or stipulated to the introduction of his statement.[6] Ultimately, how-

---

[5] The supreme court has defined a *Miranda-Goodchild* hearing as "a combined procedure designed to determine the following issues: (1) the voluntariness of a defendant's statement; (2) whether proper *Miranda* warnings were given; and (3) whether the defendant's statement was made as a result of a knowing and intelligent waiver of the *Miranda* privilege." *State v. Hockings*, 86 Wis. 2d 709, 715–16, 273 N.W.2d 339 (1979). *See also Miranda*, 384 U.S. 436; *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

[6] The prosecutor repeatedly argued that because the criminal complaint referred to Bond's statement, Bond must have known that the State intended to introduce it. The argument misses the mark. The evidence referred to in a complaint is not necessarily the evidence that will be introduced at trial. Further, in this case, defense counsel advised the court that the prosecutor never told him that the State intended to introduce Bond's statement and that as a "matter of fact, it was [defense counsel's] understanding [that the prosecutor] was not going to use it." And even accepting the prosecutor's premise that Bond should have expected the State to use his statement, a *Miranda-Goodchild* hearing, or its waiver, would have been a prerequisite to the introduction of the statement in the State's case in chief. *See* WIS. STAT. § 971.23(1)(b) (1997–98) (requiring district attorney to disclose to defendant or defendant's attorney, upon demand, before trial, "written summary of all oral statements of the defendant which the district attorney plans to use in the course of the trial" as well as names of witnesses to such statements); *State v. Benoit*, 83 Wis. 2d 389, 403, 265 N.W.2d 298 (1978) ("Precisely because [WIS. STAT. § 908.01(4)(b)1] makes any prior out-of-court statements of the defendant admissible at trial, the State must inform the defendant before trial of which statements it plans to use."); *see also Hockings*, 86 Wis. 2d at 715–16; *Miranda*, 384 U.S. 436; *Goodchild*, 27 Wis. 2d 244.

ever, the parties agreed to allow the trial court to decide Bond's motion to suppress the statement, based on the trial testimony.[7]

The trial court also missed the legal mark. Rather than ruling on the defense objections and determining whether a *Miranda-Goodchild* hearing was needed, the trial court eventually commented:

> The whole thing is absurd that it wasn't—it wasn't brought to light, if that's in fact what you're—I can't imagine that [defense counsel] would be surprised by the fact that on direct examination, or even perhaps on cross-examination, that a statement like that wouldn't have been brought out—

The trial court agreed with the State's position, concluding that the criminal complaint had given Bond notice. The trial court was mistaken. While, logically, one might join the prosecutor and trial court in assuming that Bond should have assumed that the State intended to use his statement, such assumptions do not substitute for a clear record establishing whether the State intends to introduce a defendant's statement in its case in chief, and establishing whether the trial court will permit the State to do so.

[7] Further complicating the record, while the parties explicitly advised the trial court that the only issue was whether Officer Raymond Taylor's statement to Bond was the functional equivalent of interrogation, they also asked the trial court to decide that issue based only on the portion of Detective Weston's direct examination that had occurred by that juncture in his testimony. Subsequent trial testimony, however, significantly filled out the record on which both parties now rely. Among other things, the balance of the trial testimony established: (1) that Detective Weston had mistakenly recalled that Officer Ronald Taylor, not Officer Raymond Taylor, had made the crucial remark to Bond; and (2) that Officer Ronald Taylor thought Officer Raymond Taylor's remark was "designed . . . to elicit a response from Mr. Bond." At oral argument before this court, the parties explicitly advised us, as they implicitly had done by the manner in which they presented their arguments in

¶ 8. Denying suppression of Bond's statement, the trial court provided no explanation but simply concluded that Bond's response "was not under interrogation, that it was a spontaneous statement, and voluntary statement." Bond argues that, under *Innis* and *Cunningham*, Officer Raymond Taylor's remark, "No, you're the man behind the man," was the functional equivalent of interrogation and, therefore, that his response, "Ah, so that's what this is about," should have been suppressed. We agree.

## II. DISCUSSION

¶ 9. In *Innis*, the Supreme Court "address[ed] for the first time the meaning of 'interrogation' under *Miranda v. Arizona*." *Innis*, 446 U.S. at 297. Innis, arrested for kidnapping, robbery, and murder, had been advised of his *Miranda* rights three times and had invoked his right to counsel. *See id.* at 294. While riding in the back seat of a squad car, Innis heard the two officers in the front seat discussing the possibility that a little girl from a school for handicapped children near the scene of the crime might find the gun the murderer had hidden and kill herself. *See id.* at 294–95. Innis interrupted the conversation and revealed the location of the gun. *See id.* at 295.

¶ 10. Innis contended that the officers' conversation constituted interrogation and, therefore, that under *Miranda*, because he was in custody and had invoked his right to counsel, the interrogation violated his right against compulsory self-incrimination. *See id.*

their appellate briefs, that the entire testimonial record from Bond's trial should be considered in resolving the issue of whether Officer Raymond Taylor's remark was the functional equivalent of interrogation.

at 297–98. Rejecting Innis's argument, the Supreme Court declared:

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300–02 (footnotes omitted). In a footnote, the Supreme Court provided further guidance that, as we will explain, is significant in the instant appeal:

> This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Id.* at 302 n.7.

¶ 11. Determining that the Rhode Island Supreme Court had erred "in equating 'subtle compulsion' with interrogation," *see id.* at 303, the Supreme Court concluded:

> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that [Innis] would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support [Innis's] contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that [Innis] was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id.*

¶ 12. In *Cunningham*, our supreme court quoted *Innis* extensively and "appl[ied] the *Innis* test," *see Cunningham*, 144 Wis. 2d at 281, to decide whether "confronting [a] defendant with physical evidence of a crime [is] the functional equivalent of interrogation so that subsequent statements of the defendant must be suppressed if made prior to receiving a *Miranda* warning," *see id.* at 273. Cunningham, arrested for being a felon in possession of a firearm and resisting an officer, was in custody but had not yet been advised of his *Miranda* rights. *See id.* at 275. After a police officer displayed a revolver to him, advised him that it had been found under the mattress in his bedroom, and

then said to another officer, " 'This was apparently what Mr. Cunningham was running into the bedroom for,' " Cunningham made an incriminating statement. *See id.*

¶ 13.   Applying the *Innis* test, the supreme court endeavored to give it further definition, explaining:

> [*Innis*] implies an objective foreseeability test. The test is whether an objective observer could foresee that the officer's conduct or words would elicit an incriminating response. Another way of stating the objective foreseeability test is to ask whether the police officer's conduct or speech could reasonably have had the force of a question on the suspect.

*Id.* at 278. Additionally, in words that carry important implications for the instant case, the supreme court elaborated, "An officer's specific knowledge about the suspect may indicate that the officer should have known his or her conduct or words would have had the force of a question on the suspect." *Id.* And, of equal significance, the supreme court further explained, "If an impartial observer perceives the officer's purpose to be something other than eliciting a response, the suspect is also likely to view the officer's purpose that way." *Id.* at 280.

¶ 14.   On appeal, the parties note the dearth of Wisconsin case law on the *Innis/Cunningham* issue. They agree that Bond's case presents a rare opportunity to evaluate whether certain police conduct or comment constitutes the functional equivalent of interrogation. The parties acknowledge that the facts of Bond's case, in several respects, are distinguishable from those in *Innis* and *Cunningham*. The parties also acknowledge that some of those distinguishing factors support Bond, while others would seem to favor the

State. We acknowledge that both parties have presented reasonable arguments. We conclude, on the basis of certain significant facts and several critical passages in *Innis* and *Cunningham,* that Bond's arguments prevail.[8]

¶ 15. In determining whether police conduct or comment constitutes the functional equivalent of interrogation, "[e]ach case must be considered upon its own facts." *See Cunningham,* 144 Wis. 2d at 274. "The determination of whether the facts of the case satisfy the legal standard articulated in *Innis* is a question of law" reviewed independently on appeal. *See id.* at 282. Here, five key factors link significantly to the *Innis/ Cunningham* standards and support Bond's position.

¶ 16. First, both *Innis* and *Cunningham* explain that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police *(other than those normally attendant to arrest and custody)* that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301 (footnote omitted; emphasis added); *see Cunningham,* 144 Wis. 2d at 277 (quoting *Innis*). Here,

---

[8] We acknowledge that the dissenting opinion has, for the most part, reasonably articulated the rationale supporting the State's position. We reject, however, the dissent's assertion that we have reached our conclusion "because a police officer, trying to do his job to protect this community, responded to Ondra Bond's statement 'You're the man' in a way that the majority *does not like*." Dissent at ¶ 29 (emphasis added). Whether we like or dislike the officer's response is not the issue and has no bearing on our decision. Whether the officer's response constitutes the functional equivalent of interrogation, under the standards articulated by the United States Supreme Court and the Wisconsin Supreme Court, is the issue we address.

unquestionably, the words, "No, you're the man behind the man," were not words "normally attendant to arrest and custody."

¶ 17. Second, both *Innis* and *Cunningham* emphasize that because "police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *See Innis*, 446 U.S. at 301–02; *Cunningham*, 144 Wis. 2d at 277–78 (quoting *Innis*). Further, in a footnote immediately following this passage, the Supreme Court added, "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 302 n.8; *see Cunningham*, 144 Wis. 2d at 279 (citing and paraphrasing *Innis*). Similarly, *Cunningham* explained, "An officer's specific knowledge about the suspect may indicate that the officer should have known his or her conduct or words would have had the force of a question on the suspect." *Cunningham*, 144 Wis. 2d at 278. Here, unquestionably, Officer Raymond Taylor's "specific knowledge" about Bond and the words Bond used in the threatening calls enabled him to utilize "a particular form" of speech that elicited Bond's incriminating response.[9]

---

[9] *See United States v. Perez*, 948 F. Supp. 1191, 1198 (S.D.N.Y. 1996) (FBI agent's general response to suspect's inquiry as to charges against him, in combination with agent's factually-specific assertion to suspect that " 'we know you are a Latin King,' " " 'posit[ed] [the suspect's] guilt' " and constituted

¶ 18. Third, both *Innis* and *Cunningham* explain that in determining whether police should have known that their words or actions were "reasonably likely to evoke an incriminating response," we "focus[ ] primarily upon the perceptions of the suspect," *see Innis*, 446 U.S. at 301; *Cunningham*, 144 Wis. 2d at 277 (quoting *Innis*), but we do not ignore "the intent of the police," *see Innis*, 446 U.S. at 301 n.7. *Innis* declared that "the intent of the police . . . may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Innis*, 446 U.S. at 301 n.7. And *Cunningham* provided the measure for that intent: "If an impartial observer perceives the officer's purpose to be something other than eliciting a response, the suspect is also likely to view the officer's purpose that way." *Cunningham*, 144 Wis. 2d at 280. Here, unquestionably, Officer Ronald Taylor was *not* "an impartial observer." Thus, all the more powerfully, his perception that Officer Raymond Taylor's comment "was designed . . . to elicit a response from Mr. Bond" is compelling.

¶ 19. Fourth, in *Innis*, the Supreme Court concluded that the officers' conversation did not constitute interrogation, in part because the conversation "consisted of no more than a few offhand remarks," and those remarks were not "particularly 'evocative.' " *See Innis*, 446 U.S. at 303. In *Cunningham*, the supreme

---

the functional equivalent of interrogation). Not unlike the statement in *Perez*, Officer Raymond Taylor's remark to Bond "posit[ed] guilt" insofar as it could have made sense only to one aware of the content of the threatening calls. As the prosecutor maintained in his closing argument: "When he hears the words, you['re] the man behind the man, he understands why he's under arrest. . . . Just like that, it erased his doubts of exactly what he was being arrested for . . . ."

court concluded that the officer's conduct and words did not constitute interrogation, in part because they were not even as provocative as those in *Innis*. *See Cunningham*, 144 Wis. 2d at 283. Here, by contrast, while Officer Raymond Taylor's remarks were few, they drew force from his specific knowledge of Bond, they were anything but "offhand," and, indeed, they were "particularly 'evocative' " or provocative.[10]

¶ 20.  And fifth, while in both *Innis* and *Cunningham* police officers were talking to each other in the presence of their suspects, here Officer Raymond Taylor spoke directly to Bond, eliciting his incriminating response.

¶ 21.  Still, the State emphasizes that the police comments here, like those in both *Innis* and *Cunningham*, were brief; the police did not "carr[y] on a lengthy harangue." *See Innis*, 446 U.S. at 303. We understand that. But "[e]ach case must be considered upon its own facts," *Cunningham*, 144 Wis. 2d at 274, and, somewhat ironically perhaps, the length of the Taylor/Bond exchange actually supports Bond's position. After all, Officer Raymond Taylor needed no lengthy discussion to elicit Bond's response. Speaking directly to Bond,

---

[10] The State concedes that Officer Raymond Taylor "may have tried to get a rise out of Bond by making the remark," but argues that making such a remark "does not mean it was likely to elicit an incriminating response." The State's candid concession is noteworthy. Its argument, while not entirely wrong, must be tempered by the understanding that an "incriminating response" need not be an explicit confession. "[T]he words 'incriminating response' mean any response—'whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial.' " *State v. Cunningham*, 144 Wis. 2d 272, 279, 423 N.W.2d 862 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 n.5 (1980)).

with knowledge of the words of the threatening calls, Officer Taylor was able to confront Bond immediately with the specific words that would elicit Bond's incriminating response. As the prosecutor contended in his closing argument, as soon as Bond heard Officer Taylor's words:

> [H]e understands why he's under arrest. He says, oh, that's what this is all about. Just like that, it erased his doubts of exactly what he was being arrested for, because he had made those phone calls, was well aware of those phone calls. So it should erase any last vestige of doubt any of us might have had before that happened.

¶ 22.    Thus, in this case, the *brevity* of the conversation confirms the evocative and provocative power of Officer Raymond Taylor's comment. To conclude otherwise would be to discount the claim of a defendant simply because he or she quickly succumbs to an effective police technique. That would indeed " 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of Miranda.' " *See Innis*, 446 U.S. at 299 n.3 (quoted source omitted).

¶ 23.    The State also argues that if the trial court erred by not suppressing Bond's statement, the error was harmless. The State contends that "[e]ven without introducing Bond's response to Officer Taylor's remark, the state could have presented evidence that Bond stopped asking questions about why he was arrested as soon as Officer Taylor said, 'You're the man behind the man.' " Thus, the State maintains, "This evidence, combined with Detective Weston's positive identification of Bond's voice as that of the anonymous

caller, and evidence that Bond kept following Officer Ronald Taylor while he waited to testify against Bond's brothers at their preliminary hearing, was strong proof of guilt, albeit circumstantial."

¶ 24.   A trial court error is not harmless if "there is a reasonable possibility that the error contributed to the conviction." *See State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985). To establish that the error in this case was harmless, the State, as "beneficiary of the error," bears the burden "to establish that there is no reasonable possibility that the error contributed to the conviction." *See id.*

¶ 25.   Notably, the State does *not* contend that its evidence would have been sufficiently strong to support a harmless error argument if *neither* Bond's statement *nor* his silence would have been admitted. The reason is clear. Bond was prosecuted under two alternative theories: (1) that he made the threatening calls; and (2) that if he did not make the calls, he knew about them and, as party to the crime, aided and abetted the intimidation when he came to court two days later. Thus, as Bond accurately argues, proof of his "awareness of the telephone threat was necessary to establish criminal liability" under either theory.

¶ 26.   The State does not disagree. In fact, in the trial court, the prosecutor, seeking admission of Bond's statement, asserted that Bond's response to Officer Raymond Taylor indicated awareness of the telephone threat "which is a critically relevant issue for the jury to consider." In closing argument, the prosecutor told the jury that "[t]his would be a much, much harder case if it was only about a voice I.D."

▬

¶ 27.   Not surprisingly, therefore, the State, pursuing its harmless error argument on appeal,

maintains only that Bond's silence—that is, his failure to continue asking why he had been arrested once he heard "You're the man behind the man"—would have effectively substituted for his suppressed response to Officer Raymond Taylor's remark. The State's argument has no merit. Evidence of Bond's silence would have been no more admissible than evidence of his response. "The prosecution may not . . . use at trial the fact that [a defendant] stood mute . . . in the face of accusation." *Miranda*, 384 U.S. at 468 n.37.

¶ 28.   Therefore, we conclude that the trial court erred in failing to suppress Bond's statement, and that the error was not harmless. Accordingly, we reverse and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded with directions.

¶ 29.   FINE, J. *(dissenting).*

Ah, when constabulary duty's to be done, to be done,

A policeman's lot is not a happy one, happy one.

So wrote William S. Gilbert in *The Pirates of Penzance*. Sadly, the majority's decision reverses a conviction because a police officer, trying to do his job to protect this community, responded to Ondra Bond's statement "You're the man" in a way that the majority does not like. In my view, the officer's response, "No, you're the man behind the man," made "real quickly" (Majority op. at 7) in a swirling, unstable, and potentially dangerous situation, is so far from what both the United States and Wisconsin supreme courts have characterized as the "functional equivalent of interrogation" that the rules governing what police officers in this state

can and cannot do have been dramatically and substantially changed. If today's decision is allowed to stand, the lot not only of police officers will be less happy, but, indeed, so will the lot of our community. Accordingly, I respectfully dissent.

¶ 30.   We are all familiar with how an object that appears to be bright when it is viewed in isolation will seem to have less luster when placed next to something far brighter. In my view, whether the officer's fleeting response to Bond's statement was the functional equivalent of interrogation for the purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), must be decided by comparing the circumstances here to the circumstances in the two cases that control our decision: *Rhode Island v. Innis*, 446 U.S. 291 (1980), and *State v. Cunningham*, 144 Wis. 2d 272, 423 N.W.2d 862 (1988). Once that comparison is made, it is clear that the officer's repartee to Bond was not the functional equivalent of interrogation.

¶ 31.   *Innis*: Thomas J. Innis was arrested for the shotgun robbery of a taxi driver. *Id.*, 446 U.S. at 293–294. Advised of his *Miranda* warnings, Innis told the officers that he wanted to speak with a lawyer. *Id.*, 446 U.S. at 294. Three officers rode with Innis as they took him to a police station. *Ibid.* Two of the officers then discussed how horrible it would be if the shotgun they suspected Innis had used would be found by children attending a nearby school for the handicapped. *Ibid.* Innis heard all of the comments. *Id.*, 446 U.S. at 294 n.1.

¶ 32.   One of the officers said, as related by him in his testimony, "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." *Id.*, 446 U.S. at 294–295. The third

officer, who did not participate in the discussion, testified that the first officer also "said it would be too bad if the little—I believe he said a girl—would pick up the gun, maybe kill herself." *Id.*, 446 U.S. at 295. At that point, Innis apparently had enough and said that he would show them where the shotgun was. *Ibid.*

¶ 33.  In holding that the officer's comments were not the functional equivalent of interrogation for *Miranda* purposes, the majority in *Innis* opined that "[i]t cannot be said" that the officers—expressing their concern that a little handicapped girl might, "God forbid," find the shotgun and "maybe kill herself"—"should have known that their conversation was reasonably likely to elicit an incriminating response from" Innis. *Id.*, 446 U.S. at 302. The majority explained:

> There is nothing in the record to suggest that the officers were aware that [Innis] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that [Innis] was unusually disoriented or upset at the time of his arrest.

*Id.*, 446 U.S. at 302–303. That the officer's dialogue may have constituted "subtle compulsion" and that it "struck a responsive chord" was not enough because, as the majority put it, there was nothing in the appellate record that established that Innis's "incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.*, 446 U.S. at 303.

¶ 34. Justice Thurgood Marshall, dissenting in an opinion joined in by Justice William J. Brennan, Jr., put the majority's holding in perspective:

> One can scarcely imagine a stronger appeal to the conscience of a suspect—any suspect—than the assertion that if the weapon is not found an innocent person will be hurt or killed. And not just any innocent person, but an innocent child—a little girl—a helpless, handicapped little girl on her way to school. The notion that such an appeal could not be expected to have any effect unless the suspect were known to have some special interest in handicapped children verges on the ludicrous. As a matter of fact, the appeal to a suspect to confess for the sake of others, to "display some evidence of decency and honor," is a classic interrogation technique. See, e.g., F. Inbau & J. Reid, Criminal Interrogation and Confessions 60–62 (2d ed. 1967).

*Id.*, 446 U.S. at 306. Clearly, if the compelling appeal to conscience in *Innis* was not the functional equivalent of interrogation for *Miranda* purposes, the officer's "No, you're the man behind the man" here also is not.

¶ 35. *Cunningham*: Police officers lawfully entered the home of Robert W. Cunningham to execute a search warrant. *Id.*, 144 Wis. 2d at 274–275, 423 N.W.2d at 863. Cunningham resisted the search, ran into his "bedroom in an attempt to grab or discard items near the head of the bed," scuffled with the officers, and was subdued by them. *Id.*, 144 Wis. 2d at 275, 423 N.W.2d at 863. He was arrested and handcuffed. *Ibid.* The officers did not advise him of his rights under the *Miranda* decision. *Ibid.*

¶ 36. After they subdued Cunningham, the officers searched his bedroom and "found a loaded revolver between the mattress and box spring, two to

four feet from the headboard and about one foot from the side of the bed." *Ibid.* What then happened was argued by Cunningham to be the functional equivalent of interrogation in violation of the *Miranda* and *Innis* decisions:

> One officer unloaded the revolver and then showed it to the defendant, advising him where it had been found and saying to the other officer, "This was apparently what Mr. Cunningham was running into the bedroom for." Upon seeing the revolver and hearing the officer's comment, [Cunningham] stated something to the effect that it was his bedroom and that he had a right to have a gun.

*Cunningham*, 144 Wis. 2d at 275, 423 N.W.2d at 863. Holding that what the officer did and said was not the functional equivalent of interrogation, *Cunningham* noted that *Innis* applied "at least two factors" that *Cunningham* recognized as important:

> First, the *Innis* court considered the length of conversation between the officer and the suspect in determining whether the police officer should have known that his words would elicit an incriminating response. Second, the *Innis* court looked to the emotional state of the suspect in determining the suspect's unusual susceptibility.

*Cunningham*, 144 Wis. 2d at 281, 423 N.W.2d at 866. Applying these factors here, I conclude—as in *Cunningham*—that the record in this case does not support the majority's conclusion that the officer's comment to Bond was the functional equivalent of interrogation.

¶ 37. First, the officer's remark to Bond here was fleeting—far shorter than either the show-and-say display in *Cunningham* or the dialogue in *Innis*. Moreover, unlike the situation in both *Innis* and *Cun-*

*ningham,* the officer's comment was made in immediate response to Bond's statement to the officer. Additionally, the officer's comment was not made in the calm, stable atmosphere that was present in both *Innis* and *Cunningham,* but, rather, as we have already seen, in the midst of a highly volatile situation.

¶ 38. Second, there is nothing in the appellate record here indicating that Bond's "emotional state" made him unusually susceptible to the officer's repartee. Most important, however, *Cunningham* recognizes that *Innis* is the benchmark against which assertions that are claimed to be functional equivalents of interrogation must be measured. *See Cunningham,* 144 Wis. 2d at 283, 423 N.W.2d at 866 ("The facts of this case are stronger for the prosecution than those in *Innis.* The police officer's conduct and words in this case were not as provocative as the officer's comments in *Innis.*"). The officer's response to Bond here was not nearly as provocative as were the officer's we-must-protect-the-children assertions in *Innis.* I would affirm.[1]

---

[1] That the officers' dialogue in *Innis* was not with Innis, while here the "No, you're the man behind the man" was directed to Bond in response to Bond's comment to the officer is a distinction without a difference. Thus, Justice John Paul Stevens noted in his dissenting opinion in *Innis* that the officer could have gotten Innis to tell them where the shotgun was in any one of three ways, any of which, in Justice Stevens's view, would have been the functional equivalent of interrogation for *Miranda* purposes. The officer could have:

    (1)   directly asked Innis:
       Will you please tell me where the shotgun is so we can protect handicapped school children from danger?

    (2)   announced to the other officers in the wagon:
       If the man sitting in the back seat with me should decide to tell us where the gun is, we can protect handicapped children from danger.

or (3) stated to the other officers:

> It would be too bad if a little handicapped girl would pick up the gun that this man left in the area and maybe kill herself.

In my opinion, all three of these statements should be considered interrogation because all three appear to be designed to elicit a response from anyone who in fact knew where the gun was located.

*Innis*, 446 U.S. at 312.