STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott M. HAMBLY, Defendant-Appellant.†

Court of Appeals

*No. 2005AP3087–CR. Submitted on briefs September 21, 2006.
—Decided November 22, 2006.*

2006 WI App 256

(Also reported in 726 N.W.2d 697.)

† Petition to review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martha K. Askins*, assistant state public defender, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general and *Mark A. Neuser*, assistant attorney general.

Before Snyder, P.J., Brown and Anderson, JJ.

¶ 1. SNYDER, P.J. Scott M. Hambly appeals from a judgment of conviction for one count of delivery of cocaine, contrary to Wis. Stat. § 961.41(1)(cm)1. (2001–02).[1] He contends that the circuit court erred when it denied his motion to suppress statements he made to police while in custody. Specifically, he argues that he was subjected to the functional equivalent of an interrogation and that his request for counsel was not honored. We disagree and affirm the judgment of the circuit court.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2. Two Washington County Sheriff's Department detectives arrested Hambly on September 22, 2003. Detective Michael Rindt and his colleague Detective Clausing approached Hambly as he was leaving his

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

car in the parking lot of his apartment building. Rindt told Hambly that he wanted to speak with him and asked if Hambly would meet them at the police department to discuss "several drug transactions that he was involved in." Hambly said he did not want to go to the police department.

¶ 3. Rindt repeated that they were investigating drug transactions and said to Hambly that "at this particular time there were options available to him which we wanted to speak with him about." Rindt asked Hambly if they could talk somewhere. Hambly repeated that he did not want to talk and told the detectives to come back another day. Rindt then told Hambly he was under arrest, handcuffed him, and escorted him to the squad car. As they approached the squad, Hambly said he wanted to talk to an attorney.

¶ 4. Rindt placed Hambly in the back of the squad and told him that he could call his attorney once they arrived at the jail. Rindt waited in the squad with Hambly while Clausing searched Hambly's vehicle incident to arrest. While sitting in the backseat, Hambly told Rindt he did not know why he was under arrest. Rindt told Hambly that they believed he had sold cocaine to an informant, Mychal Meyer, on three occasions and that Meyer was cooperating with the drug unit when those transactions took place. Hambly restated that he did not understand what was going on and then said that he wanted to talk to the detective and wanted to find out what his options were.

¶ 5. Rindt read Hambly the *Miranda*[2] warnings. Rindt later testified that Hambly said he understood his rights, did not have any questions, and wanted to speak to Rindt about the drug transactions. Hambly did not

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

ask for an attorney after he was advised of his *Miranda* rights. Rindt then took Hambly out of the backseat, removed his handcuffs and placed him in the front seat. He told Hambly to review his Miranda rights, which Hambly did. Hambly signed a Miranda waiver form and Rindt then interviewed Hambly for approximately one hour. Rindt asked about the drug transactions for about ten minutes and used the balance of the interview to ascertain whether Hambly would cooperate with the drug unit.

¶ 6. During the interview, Hambly stated that he "remembered Mychal Meyer and that he remembered helping him out on several occasions. And that typically when he would help him out he would sell him small quantities of cocaine . . . ." Rindt eventually decided that Hambly was either unwilling or unable to provide assistance on the drug investigation. He recuffed Hambly and placed him back into the backseat of the squad. He then took Hambly to jail.

¶ 7. The State charged Hambly with one count of delivery of cocaine, five grams or less, and two counts of delivery of cocaine, one gram or less. It alleged that Hambly sold cocaine to the informant, Meyer, on three occasions. Hambly moved to suppress the statements he made to Rindt after his arrest. Following a hearing, the circuit court denied Hambly's motion. The matter proceeded to a jury trial and the jury found Hambly guilty of delivery of cocaine, five grams or less, contrary to Wis. Stat. § 961.41(1)(cm)1. The court withheld sentence, placed Hambly on probation, and imposed three months in jail as a condition of probation. Hambly appeals.

## DISCUSSION

¶ 8. Hambly contends that his motion to suppress should have been granted because his incriminating statement was made in response to police interrogation, in custody, and after invoking his right to counsel. He makes two primary arguments: (1) Rindt caused Hambly to make the inculpatory statement by engaging in the functional equivalent of interrogation, and (2) Rindt violated Hambly's right to counsel because all conversation should have stopped once Hambly asked for an attorney. Whether evidence should be suppressed is a question of constitutional fact. *State v. Samuel,* 2002 WI 34, ¶ 15, 252 Wis. 2d 26, 643 N.W.2d 423. In reviewing questions of constitutional fact, we will uphold a circuit court's factual findings unless they are clearly erroneous, but we will independently decide whether those facts meet the constitutional standard. *Id.*

### Functional Equivalent of Interrogation

¶ 9. Hambly first contends that his inculpatory statement was a result of an illegal interrogation. Hambly directs our attention to the exchange that occurred in the squad car; specifically where Rindt told Hambly that "he was involved in selling cocaine to Mychal Meyer on three separate occasions; and Mychal Meyer . . . was cooperating with the Washington County Drug Unit when those transactions took place." Hambly stresses that interrogation is not limited to a question and answer format, but rather includes "express questioning or its functional equivalent." *See Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980).

¶ 10. Hambly argues that Rindt deliberately prompted the inculpatory statement by dropping the name of the police informant into the conversation.

Hambly asserts that when he said he didn't understand why he was arrested and Rindt responded with specific information about selling cocaine to Meyer on three occasions, the response was designed to steer him toward self-incrimination. He contends that Rindt's allegedly provocative response was the "functional equivalent" of interrogation.

¶ 11. The term "interrogation" is not limited to express questioning, but includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. The Wisconsin Supreme Court has defined the functional equivalent test as follows: "whether an objective observer could foresee that the officer's conduct or words would elicit an incriminating response." *State v. Cunningham*, 144 Wis. 2d 272, 278, 423 N.W.2d 862 (1988).

¶ 12. In *State v. Bond*, 2000 WI App 118, 237 Wis. 2d 633, 614 N.W.2d 552, *aff'd*, 2001 WI 56, 243 Wis. 2d 476, 627 N.W. 2d 484, we integrated *Innis* and *Cunningham* in our analysis of the functional equivalent of interrogation. There, an undercover officer received two threatening phone calls shortly before the officer was to testify in court. *Bond*, 237 Wis. 2d 633, ¶ 3. The caller had identified himself as "the man behind the man." *Id.* The undercover officer recognized the caller's voice during the court hearing and determined that it was Bond. *Id.*, ¶ 4. Bond, when arrested outside of the courtroom, asked why he was under arrest and then stated, "Oh, you're the man." *Id.* One of the arresting officers said, "[N]o, you're the man behind the man." *Id.*, ¶ 5. Bond responded, "Ah, so that's what this is about."

*Id.* No one had yet administered the *Miranda* warnings to Bond. *See Bond*, 237 Wis. 2d 633, ¶ 1.

¶ 13. Our decision in *Bond* rested on a five considerations. First, we concluded that the officer's controversial words, "[N]o, you're the man behind the man," were not words "normally attendant to arrest and custody." *Bond*, 237 Wis. 2d 633, ¶ 16. Second, we determined that the officer had "specific knowledge" about Bond and he should have known his words were reasonably likely to elicit an incriminating response. *Id.*, ¶ 17. Third, we inquired as to whether an impartial observer would perceive the officer's intent to be to elicit a response from Bond and decided it was so. *Id.*, ¶ 18. Fourth, we observed that the officer's words were provocative and "anything but 'offhand.' " *Id.*, ¶ 19. Finally, we noted that the officer spoke directly to Bond. *Id.*, ¶ 20. Based on these five factors, we held that Bond's statement should have been suppressed. *Id.*, ¶ 28.

■

¶ 14. Here, we distinguish the facts from those in *Bond.* We conclude that Rindt's statement to Hambly that his arrest was related to the sale of cocaine to Meyer on three separate occasions was not the functional equivalent of interrogation. First we emphasize that the statement Hambly seeks to suppress was not made in response to Rindt's statement about Meyer. Rather, when Rindt told Hambly that his arrest was related to the sale of cocaine to Meyer, Hambly repeated that he did not understand what was going on and that he wanted to talk more and find out what his options were.

¶ 15. We also note that, prior to any arrest, Rindt told Hambly he was there to investigate "several drug transactions that [Hambly] was involved in." Rindt made this statement to Hambly twice during their initial conversation. Once in custody, Hambly again

860

asked what the arrest was about. Rindt repeated that it was drug-related, specifically cocaine, and that it involved three transactions with Meyer. There was no ambush of information, so to speak, because Rindt had already made the general announcement that the entire encounter was related to drug transactions. Consequently, we are much less inclined to hold that Rindt's statement was designed to elicit an inculpatory response from Hambly.

¶ 16. We believe the situation here is more akin to that presented in *U.S. v. Taylor*, 985 F.2d 3 (1st Cir. 1993). There, Taylor was in custody and asked the officer, "Why is this happening to me?" *Id.* at 6. The officer responded, "You can't be growing dope on your property like that." *Id.* Taylor then made several incriminating statements during transport to the jail. *Id.* at 6–7. Taylor argued that the officer's response was the functional equivalent of interrogation because it was intended to elicit a response; specifically, Taylor asserted that the officer "deliberately narrowed his response by referring directly to the criminal charge" for which she had been arrested. *Id.* at 7.

¶ 17. Likewise, Hambly posits that Rindt intentionally channeled Hambly's attention toward dangerous territory by narrowing the topic to cocaine sales involving Meyer. He notes that Rindt did not simply tell him that he was under arrest on suspicion of selling drugs.[3] We take guidance from the *Taylor* court and reject Hambly's argument. The *Taylor* court determined that the officer's conduct demonstrated "no premeditated or deliberate design, but evidence[d], at

---

[3] We observe, however, that Rindt had already told Hambly twice that the matter was related to drug sales. Hambly's repeated questions make it clear that he considered this answer insufficient.

most, [his] awareness that [Taylor] might continue the conversation [Taylor] spontaneously initiated." *Id.* at 8. It explained its holding as follows:

> [Taylor] would have us propound a rule that police officers may not answer direct questions, even in the most cursory and responsive manner. It might well be argued, however, that an officer's refusal to respond to such a direct question in these circumstances would be at least as likely to be perceived as having been intended to elicit increasingly inculpatory statements from a disconsolate suspect arrested moments before.

*Id.*

¶ 18. While it is possible to imagine a situation where the police officer's relentless pursuit or premeditated provocation of such a line of inquiry is the functional equivalent of interrogation, this is not such a case. The functional equivalent test is an objective test and "does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." *Id.* at 7 (citation omitted). The mere fact that a police officer may be aware that there is a possibility that a custodial defendant may make an inculpatory statement is insufficient to establish the functional equivalent of interrogation. *Id.* at 8.

¶ 19. Hambly repeatedly made direct inquiries about the reason for his detention. Rindt gave a brief, accurate response to Hambly's direct questions. There is no evidence that Rindt knew or should have known that his words would lead to an inculpatory statement. We conclude that Rindt's explanation that Hambly's arrest was related to three cocaine sales to Meyer was not the functional equivalent of interrogation.

## Waiver of Right to Counsel

¶ 20. Hambly's second argument addresses the entire dialogue between Rindt and Hambly after Hambly invoked his right to have an attorney present for questioning. There is no dispute that Hambly invoked his right to counsel as Rindt placed him under arrest and escorted him to the squad car. Hambly argues that upon his request for an attorney, all interrogation should have immediately ceased. However, the U.S. Supreme Court has held that the accused, after invoking the right to counsel or to remain silent, may validly waive those rights and respond to interrogation. *See North Carolina v. Butler*, 441 U.S. 369, 372–76 (1979). Nonetheless, the Supreme Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).

¶ 21. The *Edwards* court instructed that when an accused has invoked the right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he or she responded to further police-initiated custodial interrogation. *Id.* at 485. The court further held that an accused, having expressed a "desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him [or her], unless the accused . . . initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85.

¶ 22. The Supreme Court has provided a two-part inquiry to determine whether a valid waiver of counsel has occurred. First, we must consider whether the accused, after invoking the right to counsel, initiated

further dialogue in a way "evinc[ing] a willingness and a desire for a generalized discussion about the investigation." *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983). If so, we must determine whether, under the totality of the circumstances, subsequent events demonstrate a knowing and intelligent waiver of the right to have counsel present during questioning. *See id.* at 1046.

¶ 23. Hambly contends that he did not initiate the conversation that led to his inculpatory statement. He asserts that his inquiry about what was happening was not the impetus to recommence questioning and therefore did not initiate the subsequent dialogue. *See Metcalf v. State of Arkansas*, 681 S.W.2d 344, 345 (Ark. 1984) ("the impetus must come from the accused, not from the officers"). He further asserts that there was never a break in his conversation with Rindt; therefore he cannot be held to have reopened a dialogue that had never stopped.

¶ 24. In *Bradshaw*, the Supreme Court took up the issue of police interrogation where the accused initiates the dialogue after having invoked the right to counsel. There, Bradshaw was advised of his *Miranda* rights, arrested, and advised of his rights again. *Bradshaw*, 462 U.S. at 1041. He denied any wrongdoing and asked for an attorney, which effectively terminated the conversation. *Id.* at 1041–42. Then, while being transported to the jail, Bradshaw asked an officer, "Well, what is going to happen to me now?" *Id.* at 1042. The officer reminded Bradshaw of his right to remain silent until an attorney was present and Bradshaw said he understood. *Id.* A conversation ensued during which they discussed where Bradshaw was being taken and the offense with which he would be charged. *Id.* During that conversation, the officer suggested that Bradshaw

864

take a polygraph examination. *Id.* Bradshaw was advised of his rights again and then submitted to the polygraph, which he failed. *Id.* Bradshaw then made inculpatory statements to the officer and was charged with multiple offenses. *Id.* He moved to suppress his statements and the trial court denied motion; Bradshaw was found guilty following a·bench trial. *Id.*

¶ 25. The Oregon court of appeals reversed Bradshaw's conviction, holding that Bradshaw's inquiry did not "initiate" the conversation with the officer and thus there was no valid waiver of the right to counsel. *Id.* at 1042–43. The United States Supreme Court reversed, explaining:

> There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue . . . .
>
> Although ambiguous, [Bradshaw's] question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship.

*Id.* at 1045–46.

¶ 26. The State argues that, like Bradshaw's inquiry, Hambly's words indicated a willingness and a desire for a generalized discussion about the investigation. Further, it emphasizes that following Hambly's request for his attorney, Rindt stopped asking questions, told Hambly that he could call his attorney once

they arrived at the jail, and then waited while Clausing searched Hambly's vehicle. According to the record, and Hambly's own statement of the facts, the next words were uttered by Hambly.

¶ 27. Rindt interpreted Hambly's question about the reason for his arrest and his options as Hambly's willingness to have further generalized discussion about the investigation. The circuit court characterized the pre-Miranda "give and take" as Hambly "probing and evading in order to try to determine what kind of trouble he was in." We agree with the court's assessment that the discussion "was clearly initiated by the defendant and although the answers to his questions may have prompted further questions, [Hambly] clearly prompted them." We conclude that Hambly initiated the conversation after he had invoked his right to counsel.

¶ 28. The final consideration is whether Hambly's purported waiver of the right to counsel was knowing and intelligent. *See Edwards*, 451 U.S. at 486 n.9. This turns on the particular facts and circumstances of the case, "including the background, experience, and conduct of the accused." *Bradshaw*, 462 U.S. at 1046 (citation omitted). More specifically, the court must "balance the personal characteristics of the accused against the pressures brought to bear, arguably forcing him or her to make the incriminating statement. *State v. Turner*, 136 Wis. 2d 333, 363, 401 N.W.2d 827 (1987). "The personal characteristics of the defendant include age, intelligence, education, physical and emotional condition, and prior experience with the police." *Id.* These factors must be balanced against inducements, methods and strategies used to persuade the accused to confess, such as the length and conditions of the inter-

rogation, psychological and physical pressures, and the provision of the *Miranda* warnings. *Id.*

¶ 29. Here, the circuit court made the relevant findings of fact, which assist us in our review. The court determined that although Hambly did "not have the level of sophistication in the criminal law that the State offers, he clearly understood that he had rights, including a right to counsel." It further concluded that the police made no threats or promises to Hambly, nor did they abuse or coerce him in any way. The court observed that the time in custody and length of the interrogation were relatively short and that the location of the interrogation was largely a product of Hambly's own choice. It stated that there was no evidence of sleep deprivation or intoxication or any other physical condition that would make him vulnerable. Also, the court made note of Hambly's prior experience with police as a juvenile.

¶ 30. In balance, the court noted that Hambly was hungry, but not allowed to eat the fast food he had with him. The circuit court also expressed some concern about Hambly's youth and lack of education, and acknowledged Hambly's "apparent limited intelligence and understanding." Ultimately, the court determined that Hambly's written statement[4] demonstrated an understanding of the system, revealed his thought process, and showed that he had been attempting to discover the extent of the State's case against him. We

_____

[4] A day or two after his arrest, Hambly wrote out a four-page statement about what happened because he "kept remembering certain things that also went on as time progressed." The circuit court referred to the written statement several times in its decision, describing it as "full of internal inconsistencies and self-serving statements."

agree that, under the totality of the circumstances, sufficient evidence supports the conclusion that Hambly knowingly and intelligently waived his right to counsel.

## CONCLUSION

¶ 31. We conclude that Hambly's inculpatory statement did not stem from the functional equivalent of interrogation; furthermore, the statement was not obtained in violation of Hambly's right to counsel. Rindt provided a brief, accurate response to Hambly's direct request for an explanation of the arrest. Moreover, Hambly waived his right to counsel where, after asking for an attorney, he initiated further conversation and the waiver was knowingly and intelligently made. Accordingly, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.