STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Stanley A. SAMUEL, Defendant-Appellant.

Supreme Court

*No. 99–2587–CR. Oral argument October 3, 2001.—Decided April 25, 2002.*

2002 WI 34

(Also reported in 643 N.W.2d 423.)

For the plaintiff-respondent-petitioner the cause was argued by *Lara M. Herman,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief by *Robert R. Henak* and *Henak Law Office, S.C.,* Milwaukee, and oral argument by *Robert R. Henak.*

¶ 1. ANN WALSH BRADLEY, J. The petitioner, State of Wisconsin, seeks review of a published court of appeals decision reversing the circuit court's judgment of conviction entered against the defendant, Stanley Samuel, on charges of sexual assault, abduction, and interference with custody.[1] The State asserts that the court of appeals erred in concluding that the same standard for suppressing a defendant's involuntary statement should also apply when a defendant seeks to suppress an allegedly involuntary statement of a witness.

---

[1] *See State v. Samuel,* 2001 WI App 25, ¶ 23, 240 Wis. 2d 756, 623 N.W.2d 565 (Ct. App. 2000) (reversing and remanding a judgment and order of the Circuit Court for Winnebago County, Thomas S. Williams, Judge).

¶ 2.  We conclude that the standards are different and that when a defendant seeks to suppress an allegedly involuntary witness statement, the coercive police misconduct at issue must be egregious such that it produces statements that are unreliable as a matter of law. In addition, we determine that when a defendant seeks to suppress statements under this standard, the proper procedure to follow is set forth in *State v. Velez,* 224 Wis. 2d 1, 589 N.W.2d 9 (1999). Finally, we apply the test we have identified to the witness statements at issue and conclude that they properly were admitted into evidence. Accordingly, we reverse the court of appeals.

I

¶ 3.  In January 1996, Tisha L., then a minor, left Winnebago County with Samuel, a 47–year-old friend. Samuel and Tisha stayed in Milwaukee for about a week, then left Wisconsin and traveled throughout several Midwestern states. In March 1997, 13 months after they left Wisconsin, Samuel and Tisha were taken into custody by the State of Missouri.

¶ 4.  Tisha was pregnant, and on March 10, the day after she returned to Wisconsin, her baby was born. Two days later, March 12, a hearing was held before a court commissioner at which it was determined that Tisha would be placed with her father. Further discussion on the issue of placement of Tisha's baby was left to an intake conference following the hearing. At the conference, Tisha was represented by an attorney. Others present for all or part of the conference included City of Oshkosh police officer Steven Sagmeister, two social workers, Tisha's father, and Cathy Stelzner, his girlfriend. Although accounts differ as to what was said at the conference, at some time during or immediately

32

following the conference, Tisha was told to contact Sagmeister to give him a statement with regard to "what had happened the previous year." After the conference, Tisha was allowed to go home with her father and Stelzner, and the baby was temporarily placed in foster care.

¶ 5. Tisha's father and Officer Sagmeister made arrangements for Tisha to meet with Sagmeister on March 13, 1997. On that day, Tisha gave a tape recorded statement to Sagmeister and one of the social workers, Rod Schraufnagel, at the police station. She said that she and Samuel had been sexually active in Winnebago County before they left the state. At the time of that sexual activity, Tisha was under age 16.[2]

¶ 6. The next morning, March 14, another hearing was held before the court commissioner, at which Tisha's baby was returned to her. Following the hearing, Officer Sagmeister asked Tisha if she would give a second statement because the tape from the first day had not turned out very well. Tisha and her father agreed, and Sagmeister and Schraufnagel conducted another recorded interview with Tisha. Again, Tisha indicated that she had sexual relations with Samuel in 1995 prior to leaving Winnebago County.

¶ 7. Tisha gave a third statement on March 21, when Officer Sagmeister came to her residence. After questioning Tisha, Sagmeister summarized her answers in a written statement that Tisha signed. The written statement shows that Tisha and Samuel first had sexual relations in the middle of September 1995 and also had sexual relations twice in Milwaukee after leaving Winnebago County in January 1996.

---

[2] The information shows Tisha's date of birth as September 7, 1980.

¶ 8. Samuel was formally charged with interference with custody, abduction, and sexual assault of a child. He moved in limine to suppress all of Tisha's statements. At the hearing on the motion, Samuel argued that Tisha's statements should be suppressed because they were the result of police threats or coercion. Tisha, her father, her attorney, and Stelzner testified with regard to the circumstances surrounding both the intake conference and the times at which Tisha gave her statements.

¶ 9. The circuit court denied the motion, determining that Samuel was without standing to assert that Tisha's statements were coerced in violation of her constitutional rights. Instead, the court concluded, it was for the jury to determine the credibility and weight of Tisha's statements.

¶ 10. At trial, the State called Tisha as a witness, and she testified that she and Samuel had a sexual relationship, but that they did not have sexual intercourse until March or April 1996, which was months after she left Wisconsin with Samuel. While Tisha was still under direct examination, the State proceeded to impeach her with her prior inconsistent statements:

> Q Isn't it also true, however, Tisha, that you have given three statements prior to this date which indicated you became sexually active with Mr. Samuel in September of 1995?
>
> A Yes, I think I did.

The State showed Tisha her March 21, 1997 written statement and asked her several questions about it. Tisha maintained that she did not remember saying anything in the statement with regard to when, where, or how often she and Samuel had sexual relations. She

34

later testified that the statements were not true, but that she had given them because she felt pressured to incriminate Samuel at the intake conference.

¶ 11. Tisha's father, Stelzner, Officer Sagmeister, and Schraufnagel also gave testimony relevant to the circumstances surrounding Tisha's statements. Although the witnesses each had different perceptions as to whether Tisha was improperly pressured, no one recalled that she was expressly told she would lose her baby unless she implicated Samuel.

¶ 12. The jury convicted Samuel on all three charges. Samuel brought a postconviction motion, again arguing that Tisha's statements should have been suppressed because they were coerced. The circuit court denied the motion. The court determined that regardless of whether Tisha's statements were coerced, Samuel had no standing to challenge them, and the question of any witness coercion was best left to the jury.

¶ 13. Samuel appealed, and the court of appeals reversed. Citing *United States v. Gonzales,* 164 F.3d 1285, 1289 n.1 (10th Cir. 1999), the court reasoned that police methods of coercion that are "offensive when used against an accused do not magically become any less so when exerted against a witness." Referring to the test for involuntariness set forth in *State v. Clappes,* 136 Wis. 2d 222, 401 N.W.2d 759 (1987), the court of appeals concluded that the standard for suppressing a defendant's involuntary statements should also apply to the suppression of involuntary witness statements.

¶ 14. In *Clappes,* 136 Wis. 2d at 236, this court applied a totality of the circumstances test in order to assess whether confessions are involuntary. That test requires courts to "balance the personal characteristics of the defendant against the pressures imposed upon him by police in order to induce him to respond to the

questioning." *Id.* In determining whether a confession is voluntary, the essential inquiry is whether the confession was procured via police coercion. *Id.* at 235–36. The court of appeals remanded Samuel's case for the circuit court to determine whether, under the *Clappes* test, Tisha's statements were involuntary.

## II

¶ 15. We are asked to determine the proper standard under which a witness's involuntary statements must be suppressed at the trial of a criminal defendant. Whether evidence should be suppressed is a question of constitutional fact. *See State v. Anderson,* 165 Wis. 2d 441, 447, 477 N.W.2d 277 (1991); *State v. Bermudez,* 221 Wis. 2d 338, 346, 585 N.W.2d 628 (Ct. App. 1998). In reviewing questions of constitutional fact, we uphold a circuit court's factual findings unless clearly erroneous, but we independently determine whether those facts meet the constitutional standard. *State v. Dagnall,* 2000 WI 82, ¶ 27, 236 Wis. 2d 339, 612 N.W.2d 680; *State v. Phillips,* 218 Wis. 2d 180, 189–90, 577 N.W.2d 794 (Ct. App. 1998).

¶ 16. In making our determination of whether Tisha's statements should have been suppressed, we consider in turn the standards advanced by the State and Samuel. However, we conclude that neither standard strikes the proper balance between the Fourteenth Amendment's guarantee of due process and the fact that witness statements that are in some sense compelled are frequently neither unreliable nor the product of egregious police misconduct. In steering a course between the positions advanced by the parties and using due process as our guide, we recognize there are

circumstances under which egregious police misconduct deprives the defendant of a fair trial.

## III

¶ 17.   The State contends that a defendant's right to due process is offended only where witness statements are extracted by "extreme coercion or torture." *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984). It argues that absent such extreme circumstances, it is the jury's role to weigh and assess credibility. Samuel asserts that involuntary witness statements should be subject to the same rule of suppression as a criminal defendant's involuntary confession. *See Clappes*, 136 Wis. 2d at 222. He argues that a defendant's Fourteenth Amendment due process right to a fair trial bars the admission of all involuntary witness statements that are the product of police coercion.

¶ 18.   With due process as our touchstone, we turn first to the standard advanced by the State. We are not convinced, as the State asserts, that a defendant's right to due process will be offended only where the witness statements used against the defendant derive from police conduct that amounts to extreme coercion or torture. The "blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960); *see also Raphael v. State*, 994 P.2d 1004, 1008 (Alaska 2000). Although the United States Supreme Court in *Blackburn* was referring to the defendant, we similarly decline to hold that the blood of a witness is a necessary hallmark of an unconstitutional trial. Instead, we determine there are circumstances where witness statements derived by egregious police misconduct short of extreme coercion or torture must be suppressed in order to uphold

37

fundamental fairness to a defendant. In short, we reject the State's test as setting the bar too high to satisfy due process.

■

¶ 19.  Next, we turn to the standard advanced by Samuel, that witness statements should be suppressed based on the same test as applied to a defendant's confession. We begin by examining the rights protected along with the purposes served by the suppression of involuntary confessions. It is well established that confessions by criminal defendants must be voluntary in order to be admitted as evidence at trial. *See State v. Hunt,* 53 Wis. 2d 734, 740, 193 N.W.2d 858 (1972); *see also Lynumn v. Illinois,* 372 U.S. 528, 534 (1963).

¶ 20.  The rule requiring suppression of involuntary confessions has long been grounded in the defendant's due process rights. *See Brown v. Mississippi,* 297 U.S. 278, 286 (1936). In addition, in *Malloy v. Hogan,* 378 U.S. 1, 7 (1964), and *Miranda v. Arizona,* 384 U.S. 436, 464 n.43 (1966), the Supreme Court linked the rule to the Fifth Amendment right against self-incrimination.

¶ 21.  Several related purposes have been cited in support of the rule. These include the "deep-rooted feeling that the police must obey the law while enforcing the law," *Arizona v. Fulminante,* 499 U.S. 279, 293 (1991); the notion that the government should be required to produce evidence against the accused "by its own independent labors rather than by the cruel, simple expedient of compelling it from his own mouth," *Miranda,* 384 U.S. at 460; and, a concern that statements that are the product of coercion are more likely to be inherently untrustworthy than voluntary statements, *Spano v. New York,* 360 U.S. 315, 320 (1959).

¶ 22. These rights and purposes do not all apply when a defendant seeks to suppress involuntary witness statements. *See LaFrance v. Bohlinger,* 499 F.2d 29, 33–34 (1st Cir. 1974); *State v. Vargas,* 420 A.2d 809, 814 (R.I. 1980). A nondefendant witness's right against self-incrimination generally is not in play at the trial of the defendant. "When the defendant seeks to exclude the fruit of the coerced statement of another . . . the policy of protecting the defendant from being compelled to aid the state in convicting him is not at stake." *People v. Badgett,* 895 P.2d 877, 886 (Cal. 1995). Likewise, the idea that the government must produce evidence by its own independent labors rather than by compelling it from the mouth of the accused does not seem to justify the suppression of statements by those other than the accused.

¶ 23. Therefore, we disagree with Samuel that the *Clappes* test governing involuntary confessions can alone dictate the standard for suppression of involuntary witness statements. Because the rights protected and the purposes served by suppression of a defendant's confession do not all apply when considering the suppression of a witness's statement, something additional is needed before a witness's statement will be suppressed. The *Clappes* test sets the bar for suppression of witness statements too low. Although we agree that the suppression of witness statements requires that those statements be involuntary under *Clappes,* it also requires something more.

¶ 24. Often, witness statements that are in some sense compelled are neither inherently unreliable nor the product of police misconduct. For example, we have held that, as a general rule, a defendant's right to a fair trial is not violated by the admission of testimony by a defendant's accomplice even where the State has ex-

pressly granted concessions to the accomplice in exchange for the testimony. *State v. Nerison,* 136 Wis. 2d 37, 45, 401 N.W.2d 1 (1987). "[C]ross-examination, not exclusion, is the proper tool for challenging the weight and credibility of accomplice testimony." *Nerison,* 136 Wis. 2d at 45; *see also State v. Miller,* 231 Wis. 2d 447, 465, 605 N.W.2d 567 (Ct. App. 1999).[3]

¶ 25. A rule suppressing witness statements must recognize the admissibility of evidence such as accomplice testimony and also protect a defendant's due process right to a fair trial. Although we have rejected Samuel's test as setting the bar too low, we acknowledge that some of the purposes served by the suppression of involuntary confessions apply equally in the context of involuntary witness statements. Both the maxim that police obey the law while enforcing the law and the need to avoid convictions based on inherently unreliable evidence apply whether the statements at issue spring from the mouth of the criminally accused or another. Although there is no "absolute parallel" between involuntary confessions and involuntary witness statements, *LaFrance,* 499 F.2d at 35, there is a point at which some of the same considerations apply to both.

---

[3] When the State relies on accomplice testimony, the defendant's right to a fair trial is protected as long as there is:

> (1) full disclosure of the terms of the agreements struck with the witnesses; (2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and (3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the state to testify against the defendant.

*State v. Nerison,* 136 Wis. 2d 37, 46, 401 N.W.2d 1 (1987); *State v. Miller,* 231 Wis. 2d 447, 465, 605 N.W.2d 567 (Ct. App. 1999).

¶ 26.  In *United States v. Merkt,* 764 F.2d 266, 274 (5th Cir. 1985), the Fifth Circuit Court of Appeals acknowledged that the fact that witnesses' statements were themselves unlawfully obtained was not alone sufficient to necessitate suppression. Instead, the Fifth Circuit determined that it was "egregious" intimidation and coercion of witnesses that would prompt the suppression of their statements. *Id.* at 275. Under such circumstances, "the government's investigation methods result[ ] in a fundamentally unfair trial." *Id.* at 274. In *Merkt,* the court discussed *United States v. Fredericks,* 586 F.2d 470, 481 n.14 (5th Cir. 1978), in which it had reasoned that the fundamental fairness essential to due process is undermined when a witness's statement is obtained through "shocking and intentional" police misconduct.

¶ 27.  Likewise, this court has recognized that it is when police misconduct rises to an "egregious" level that it offends due process. *State v. Hanson,* 136 Wis. 2d 195, 211, 401 N.W.2d 771 (1987) (citing *Moran v. Burbine,* 475 U.S. 412, 432 (1986)). In *Hanson,* we concluded that when a suspect has not invoked his Fifth Amendment right to counsel, police may withhold information that there is an attorney available asking to see him. However, we cautioned, as did the Supreme Court in *Burbine,* that "on facts more egregious than those presented . . . police deception might rise to a level of a due process violation." *Hanson,* 136 Wis. 2d at 211 (quoting *Burbine,* 475 U.S. at 432).

¶ 28.  Similarly, in *Badgett,* 895 P.2d at 887, the California Supreme Court concluded that in order for defendants to assert violations of their due process rights, they must allege that the coercive methods used to obtain a witness statement were such that they would actually affect the reliability of the evidence

41

presented at trial. The court explained that "[t]estimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony." *Id.*

¶ 29. As this court has observed in the context of involuntary confessions, although they may in some cases be unreliable, in other cases they are reliable. See *State v. Agnello*, 226 Wis. 2d 164, 173, 593 N.W.2d 427 (1999); *J.G. v. State*, 119 Wis. 2d 748, 760, 350 N.W.2d 668 (1984). The same can be said of involuntary witness statements. Involuntary confessions are suppressed regardless of the truthfulness of a confession in an individual case. *See Lego v. Twomey*, 404 U.S. 477, 484–85 (1972); *Agnello,* 226 Wis. 2d at 173. However, because a defendant's right against self-incrimination is not at issue with regard to statements by others, the suppression of those statements at the defendant's trial demands a more rigorous standard.

¶ 30. With due process as our touchstone, we conclude that when a defendant seeks to suppress witness statements as the product of coercion, the police misconduct must be more than that set forth in *Clappes*. It must be egregious such that it produces statements that are unreliable as a matter of law. The coercion must be egregious because, as we have shown, it is typically "egregious" police misconduct that offends due process. Our concern is with police misconduct that, by its nature, undermines confidence in the reliability of a witness's statements. Witness statements obtained by police methods that induce lying have no place in our system of justice because a conviction based on unreliable evidence undermines the fundamental

42

fairness of a defendant's trial. In short, due process demands that the State not marshal its resources against an accused in a manner that results in a conviction based on unreliable evidence obtained through egregious police practices.

¶ 31. Upon an examination of the case law and the parties' arguments, we glean several factors to consider in determining whether police misconduct is egregious such that it produces statements that are unreliable as a matter of law. These factors include (1) whether a witness was coached on what to say; (2) whether investigating authorities asked questions blatantly tailored to extract a particular answer, *see Gonzales,* 164 F.3d at 1289; (3) whether the authorities made a threat with consequences that would be unlawful if carried out, *see United States v. Tingle,* 658 F.2d 1332, 1335–36 (9th Cir. 1981);[4] (4) whether the witness was given an express and unlawful quid pro quo; (5) whether the State had a separate legitimate purpose for its conduct, *Tingle,* 658 F.2d at 1337; and, (6) whether the witness was represented by an attorney at the time of the coercion or statement, *see Merkt,* 764 F.2d at 269. The presence of the first four factors weighs in favor of suppression while the presence of the second two factors weighs against it. Application of these and other relevant factors will help to ensure that it is unreliable evidence that is suppressed. It will also help to guarantee that the State does not obtain convictions based on practices that offend fundamental fairness.

---

[4] We recognize that *United States v. Tingle,* 658 F.2d 1332 (9th Cir. 1981), involved involuntary confessions by a defendant; nevertheless, we deem its discussion helpful in identifying criteria that are useful in a suppression determination under the test we apply to Samuel.

¶ 32. In cases where an application of the factors results in a determination that witness statements at issue will not be suppressed, the defendant nevertheless retains the ability to test the credibility of the witness statements through, among other approaches, cross-examination before the jury. *See Nerison,* 136 Wis. 2d at 45. Cross-examination is an essential tool for "sifting the conscience of the witness" and thereby protecting a defendant's rights at trial. *State v. Bauer,* 109 Wis. 2d 204, 208 n.3, 325 N.W.2d 857 (1982) (citing *Mattox v. United States,* 156 U.S. 237, 242–43 (1895)). The jury, of course, has the duty to scrutinize and weigh the testimony of witnesses and to determine the effect of the evidence as a whole. *See Hampton v. State,* 92 Wis. 2d 450, 462, 285 N.W.2d 868 (1979); Wis JI—Criminal 300.[5] These safeguards—cross-examination and the jury's role in weighing the evidence—help ensure a fair trial where due process does not require the suppression of witness statements.

## IV

¶ 33. We next address the proper procedure for circuit courts and parties to follow when a defendant wishes to assert that witness statements should be suppressed under the standards we have identified. Both Samuel and the State refer to *Velez,* 224 Wis. 2d 1, as providing a model procedure. The issue presented in *Velez* was whether a defendant is entitled to an evidentiary hearing upon an allegation that the State inten-

[5] Here, the jury received a version of the standard instruction on witness credibility, which includes an instruction that the jury should consider motives for falsifying testimony. *See* Wis JI—Criminal 300.

44

tionally "manipulated the system" to avoid juvenile court jurisdiction and charge a defendant as an adult. *Id.* at 6. In *Velez,* as here, it was the defendant's due process rights that were at issue. *See id.* at 14.

¶ 34.    Therefore, we agree with the parties that the procedures outlined in *Velez* should be applied in this case. As the circuit court correctly observed in its decision on Samuel's suppression motion, although the jury is normally the sole judge of the credibility and weight given to witness statements,

> [e]xceptions are made where a threshold finding is made by the court, since presentation to the jury would expose them to evidence which might be otherwise barred by constitutional principles.

The *Velez* procedures will protect a defendant's due process rights while also preserving scarce judicial resources by eliminating unnecessary evidentiary hearings. *See* 224 Wis. 2d at 12.

¶ 35.    Under *Velez,* first the defendant must bring a motion to suppress, alleging facts sufficient to show that a statement was involuntary under *Clappes* and that the police misconduct at issue is egregious such that it produces statements that are unreliable as a matter of law. *See Velez,* 224 Wis. 2d at 18. If the motion alleges facts which, if true, would entitle the defendant to relief, then the circuit court must hold an evidentiary hearing. *Id.; see also State v. Bentley,* 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996). However, if the motion does not allege sufficient facts, the circuit court has the discretion to deny an evidentiary hearing upon a finding that any one of the following circumstances is present:    (1) the defendant failed to allege sufficient

45

facts in the motion to raise a question of material fact; (2) the defendant presented only conclusory allegations; or (3) the record conclusively demonstrates that the defendant is not entitled to relief. *Velez,* 224 Wis. 2d at 17–18.

¶ 36.   Even where the defendant has not met this initial burden of production and the circuit court has the discretion to deny an evidentiary hearing, in order to properly exercise that discretion, it must "carefully consider the record, the motion, counsels' arguments and/or offers of proof, and the law." *Velez,* 224 Wis. 2d at 17 (quoting *State v. Garner,* 207 Wis. 2d 520, 534–35, 558 N.W.2d 916 (Ct. App. 1996)). Moreover, when there is a reasonable possibility that the defendant will establish the factual basis at an evidentiary hearing, the circuit court must provide the defendant with the opportunity to develop the record. *Id.* at 18.

¶ 37.   In other words, there will be cases where the court cannot properly exercise its discretion in denying an evidentiary hearing without first holding a nonevidentiary hearing on the defendant's motion to suppress. *See Velez,* 224 Wis. 2d at 17. The facts that the defendant must establish and the determinations the circuit court must make will be informed by the standard and factors we have identified.

¶ 38.   We must also address the question of who bears the burden of persuasion once the defendant has established a factual basis necessitating an evidentiary hearing. Samuel argues that the burden of persuasion should lie with the State, but acknowledges that the level of that burden is the preponderance of the evidence. We agree.

46

¶ 39. In *Velez,* this court suggested that due process was not offended by placing a burden of production on the defendant because the State bore the ultimate burden of persuasion with regard to the government misconduct at issue. *See* 224 Wis. 2d at 16. Where a defendant makes a prima facie showing that a confession is involuntary, the State bears the burden of proving, by the preponderance of the evidence, that it is not. *Agnello,* 226 Wis. 2d at 179; *State v. Williams,* 220 Wis. 2d 458, 463, 583 N.W.2d 845 (Ct. App. 1998). Although we have identified a different substantive test for the suppression of witness statements, given *Velez* and the rule on the burden of proof for confessions, we discern no need to inject a different rule into our due process jurisprudence. The burden of persuasion lies with the State, and the burden the State must meet is a preponderance of the evidence.

V

¶ 40. As noted earlier, the question of whether evidence must be suppressed under a constitutional standard is ultimately a question that this court determines independently. *Anderson,* 165 Wis. 2d at 447. Upon an examination of the record in this case, we conclude as a matter of law that Tisha's statements should not have been suppressed. No reasonable view of the evidence can support the conclusion that Tisha's statements were coerced by egregious methods that produced statements unreliable as a matter of law. Indeed, the circuit court at the postconviction motion hearing, after hearing all of the evidence, opined that Tisha's statements were not the product of police coercion. The circuit court stated:

47

[A]nd in this case, in all honesty, the Court wouldn't be able to even find coercion. This is a totally different type of circumstance than say a witness comes in and she's a mother and the police say if you don't tell us what we want to hear, we're taking your child.

This is a case in which the mother was a minor on the run, who gave birth while on the run and was subsequently returned. It was her acts for which the child was initially taken into custody . . . it was her acts beforehand which led to originally there being an issue as to whether the child would remain with her or not. And in light of the fact as well that she was not told what to say but just to cooperate here, doesn't to this court say that it's been inferred that she has to say what they want her to say or she won't get her child back.

¶ 41.   Nonetheless, we apply the factors we have identified, ultimately arriving at the same result as the circuit court.[6] We first note that there is little if any credible evidence that Tisha was specifically coached on what to say or that the authorities' questions were blatantly tailored in order to compel her to implicate Samuel. On the contrary, Tisha's father testified that neither Officer Sagmeister nor the social worker,

---

[6] The dissent concludes that Samuel's case should, "at the very least," be remanded to the circuit court for a determination of whether Tisha's allegedly coerced statements should be suppressed. Dissent at ¶ 50. It appears to overlook, however, that the circuit court already opined that the statements were not the product of police coercion. As noted above in paragraph 40, the circuit court stated that "in all honesty, the Court wouldn't be able to even find coercion." It would be a futile exercise to remand this case for a determination by the circuit court of whether the coercive police misconduct here was egregious such that it produced statements unreliable as a matter of law when the circuit court stated it "wouldn't be able to even find coercion."

Schraufnagel, told Tisha that she needed to say anything in particular in order to get her baby back. Tisha's testimony focused on the fact that she was repeatedly told she had to "cooperate" in general. Although at one point in her testimony she indicated that someone said she would not get her baby back until she implicated Samuel, when pressed, she could not remember who had said this or whether those were the exact words the speaker had used.

¶ 42. Similarly, the record does not show that authorities ever expressly threatened Tisha with the loss of her baby, although that was a possibility regardless of whether Tisha implicated Samuel. Stelzner testified that she thought there was "blackmail" involved, but was unable to explain in any detail why she so believed. The record does not show that anyone presented Tisha with an illegal quid pro quo, such as a promise that she would be able to keep her baby if she agreed to implicate Samuel. In addition, the factor of representation by counsel does not weigh strongly in favor of either Samuel or the State. Although Tisha was represented by an attorney at the intake conference, she was not represented at other times in which Samuel alleges she was coerced.

¶ 43. Finally, and perhaps most convincingly in this case, the authorities involved had a separate legitimate purpose for questioning Tisha with regard to Samuel. They needed to determine the proper placement of her baby, which depended on an assessment of whether she was a flight risk and whether she could be trusted to care properly for her newborn child. Although we recognize there may be cases where a legitimate purpose for questioning a witness is trans-

formed into an illegitimate pretext for a criminal investigation, the record in this case does not support such a conclusion.

## VI

¶ 44. In sum, the test for the suppression of witness statements is a *Clappes*-plus test. The court, in *Clappes,* applied a totality of the circumstances test when assessing whether a defendant's confession is voluntary. The *Clappes* test requires a court to look at both the defendant's response as well as the police misconduct, and to "balance the personal characteristics of the defendant against the pressures imposed upon him by the police in order to induce him to respond to the questioning." 136 Wis. 2d at 236.

¶ 45. Because the rights protected and the purposes served by suppression of a defendant's confession do not all apply when considering the suppression of a witness's statement, something more is needed before a witness's statement will be suppressed. That something more is the degree of police misconduct.

¶ 46. Thus, as in *Clappes,* a totality of circumstances test is applied when considering the suppression of a witness statement. The personal characteristics of a witness must be balanced against the conduct of the police in pressuring a witness in order to induce a response. However, we determine that when a defendant seeks to suppress witness statements as involuntary, the coercive police misconduct must be greater than that necessary under *Clappes* for the suppression of a defendant's confession: it must be egregious such that it produces statements that are unreliable as a matter of law.

¶ 47. In addition, we determine that where the defendant seeks to suppress witness statements, the

parties must follow the procedure set forth in *Velez*. Finally, we conclude that on the record before us, Tisha's statements were not derived from egregious police misconduct that would produce statements unreliable as a matter of law.[7] Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 48.   WILLIAM A. BABLITCH, J. *(dissenting)*. I agree with the majority's standard which requires the suppression of witnesses' statements when they are coerced through egregious police misconduct such that the statements are rendered unreliable as a matter of law, while considering the totality of the circumstances. Majority op. at ¶ 46.

¶ 49.   However, it is impossible for me to reconcile the enunciated standard with the failure of the majority to remand given the totality of the circumstances present. This does not strike me as a close case at all. As a result, lower courts will ask, with some degree of confusion, if these facts do not do it, what does?

---

[7] The court of appeals concluded that it was required to reverse Samuel's convictions for abduction and interference with custody because, if the circuit court were to determine on remand that Tisha's statements were inadmissible, the admission of the statements may have improperly undermined Tisha's credibility and tainted the jury's assessment of the evidence at trial. Because we conclude that Tisha's statements were properly before the jury, we need not address Samuel's argument that the admission of the statements improperly tainted his conviction on the abduction and interference with custody charges. For the same reason, we do not address the State's argument that the admission of Tisha's statements was harmless error with regard to those two charges.

51

¶ 50.  I conclude that this case should, at the very least, be remanded. The record raises serious questions as to the interrogation methods employed during the intake conference and immediately thereafter. A determination on whether the police conduct was egregious involves matters of credibility that only a circuit judge can determine at an evidentiary hearing. Further, the circuit court must examine the totality of the circumstances when making its determination. Accordingly, I respectfully dissent to the mandate of the majority opinion.[1]

¶ 51.  The following sequence of events is telling. On March 10, 1997, Tisha's baby is born. On March 12, 1997, the baby is taken from Tisha and placed in a foster home after Tisha repeatedly refuses to "cooperate" with the police. The next day, Tisha "cooperates" with the police by answering questions that implicate Samuel with respect to her sexual relationship with Samuel. Tisha's baby is returned to her on March 14, 1997.

¶ 52.  No one denies that Tisha was told she must cooperate with the police. But cooperate how? Was it reasonable for Tisha to believe that she had to implicate Samuel or lose her baby forever? The circuit court never reached this determination. The circuit court merely determined that Samuel had no standing to raise an objection to the admission of Tisha's statement.

---

[1] This dissent did not "overlook," as stated in the majority opinion's response to the dissent, that the circuit court has "already opined that the statements were not the product of police coercion." Majority op. at ¶ 41 n. 6. The circuit court issued that opinion without the benefit of the new standard enunciated in the majority opinion. The circuit court could hardly apply a standard that was not even in existence at the time it so opined.

At the very least, this case should go back for an evidentiary hearing following the procedural standards adopted by the majority from *State v. Velez,* 224 Wis. 2d 1, 589 N.W.2d 9 (1999). *See* majority op. at ¶¶ 33–39.

¶ 53. There is more in this record, none of which has been challenged, to support my view that Samuel has met his burden in producing evidence to show egregious conduct sufficient to force an evidentiary hearing. In particular, David Keck, Tisha's attorney, testified that it was his personal impression that Tisha had to give a statement to police regarding the unlawful sexual relationship with Samuel in order to get her baby back. In addition, Peter L., Tisha's father, testified that he spoke with a sexual abuse investigator with the Department of Social Services and was told that the police needed to know where and when Tisha and Samuel had sex. Peter gave this information to Tisha. Finally, Catherine Steltzer, Peter's girlfriend, testified that she was told they would consider giving the baby to Tisha if she cooperated. It was her impression that the baby was being used as a pawn and that this was blackmail.

¶ 54. If in fact Tisha was threatened with the loss of her baby unless she confessed to an unlawful sexual relationship with Samuel, such threats, implicit or explicit, constitute egregious police conduct. This record contains much evidence, none of it challenged, that leads to that conclusion. I would send it back for the circuit court's determination of the facts and conclusions.

¶ 55. I therefore respectfully dissent.