STATE of Wisconsin,
Plaintiff-Appellant,

v.

Lance F. TRUAX,
Defendant-Respondent.†

Court of Appeals

*No. 2008AP70–CR. Submitted on briefs February 19, 2009.
—Decided April 8, 2009.*

2009 WI App 60

(Also reported in 767 N.W.2d 369.)

† Petition to review denied 6/16/09.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Katherine Lloyd Tripp*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Kiley B. Zellner* of *Pruhs Law Office, S.C.*, Milwaukee.

Before Brown, C.J., Snyder and Neubauer, JJ.

¶ 1. NEUBAUER, J. The sole issue in this case is whether the officer who arrested Lance F. Truax for operating while intoxicated[1] was engaged in a bona fide community caretaker function at the time he approached Truax's vehicle. The State of Wisconsin appeals from a trial court order dismissing its complaint against Truax. The State argues that the trial court erred in granting Truax's motion to suppress evidence of intoxication obtained as a result of the stop of his vehicle based on its finding that the officer was not engaged in community caretaker activity. We conclude that the supreme court's recent analysis in *State v. Kramer*, 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598, guides our decision and compels the determination that the officer was engaged in a bona fide community caretaker function. We therefore conclude that the trial court erred in granting Truax's motion to suppress. We reverse the trial court's dismissal order and remand with directions to reinstate the complaint.

## BACKGROUND

¶ 2. The facts surrounding the stop of Truax's vehicle, as adduced at the preliminary hearing and motion hearing, are largely undisputed. Officer Eric Hansen of the Village of Menomonee Falls Police Depart

---

[1] Truax was later charged with operating while intoxicated and operating with a prohibited blood alcohol concentration, both as fifth or subsequent offense, contrary to WIS. STAT. § 346.63(1)(a) and (b), and operating after revocation (OAR) contrary to WIS. STAT. § 343.44(1)(b).

ment was on routine patrol on the evening of July 7 into the morning of July 8, 2007. He had been assigned by his supervisor to monitor the area of Silver Spring Drive because July 7, 2007, was a "highly publicized date for weddings" and thus Hansen was directed to monitor the area for "disabled vehicles or whatever the case may be." At approximately 12:30 a.m., Hansen was near the intersection of Silver Spring Drive and Davian Drive traveling west at twenty-five miles per hour. Hansen had been driving under the fifty-mile-per-hour speed limit because he "was monitoring [] Davians Banquet Center," observing the number of people outside and making sure that there were no fights or altercations occurring at that time. Hansen was in a "[f]ully marked Ford Crown Victoria with overhead emergency lights, a front push bar, and side markings."

¶ 3. When he was near the intersection of Continental and Silver Spring, Hansen observed a vehicle pass him in the opposite direction, traveling eastbound. The vehicle appeared to be traveling within the fifty-mile-per-hour speed limit. As the vehicle passed Hansen, he observed the driver "immediately pull[] off to the right-hand side of the roadway very abrupt[ly] and quickly onto the shoulder." Hansen considered this to be "unusual behavior" because there were neither obstacles in the roadway nor any other reason for the vehicle to have pulled over. However, he did not observe anything to indicate a violation of the law.

¶ 4. Hansen continued traveling west on Silver Spring, during which time he monitored the vehicle in his side and rearview mirrors "to make sure that there were no problems or anyone flagging [him] down." Hansen noted that the driver placed the vehicle in park, and in continuing to monitor the vehicle for an additional ten to fifteen seconds, no one exited the vehicle.

Hansen testified that he became concerned that the driver may have a medical condition or a mechanical problem such as a "blown tire" which would explain the abrupt exit from the roadway. Hansen also considered whether the driver might be lost or using a cell phone. He was "concerned for the well-being of the driver inside at that time."

¶ 5. Hansen made a U-turn and proceeded east back towards the vehicle, which was stopped directly across the street from Davians Banquet Center. He noted that there were "no other vehicles on the entire roadway during this time." He pulled in behind the vehicle, activated his overhead emergency lights to alert approaching vehicles, and notified dispatch that he would be "checking a possible disabled vehicle." Hansen approached the driver's side of the vehicle and made contact with the driver, who he later identified as Truax. Hansen asked Truax "if he needed assistance," and Truax told him that he was looking for his girlfriend, who had been with him earlier at Davians Banquet Center.

¶ 6. During his contact with Truax, Hansen noted that Truax had "red, watery eyes," a "thick tongue or slurred speech," and "a very strong odor of intoxicants." Hansen asked whether Truax had been consuming alcohol and Truax responded, "Yes, probably too much." After administering field sobriety testing, Hansen determined that Truax was impaired and took him into custody for operating while intoxicated. The State subsequently issued a criminal complaint charging Truax with operating a motor vehicle while intoxicated and operating with a prohibited alcohol concentration, both as a fifth and subsequent offense and with an alcohol fine enhancer based on Truax's blood alcohol reading of .21. The State also charged Truax with operating after revocation, first offense.

¶ 7. Truax filed a motion to suppress evidence obtained during the stop of his vehicle based on lack of reasonable suspicion. Following a hearing on November 13, 2007, the trial court granted Truax's motion to suppress and his subsequent motion to dismiss the complaint. The State appeals.

## DISCUSSION

¶ 8. Whether evidence should be suppressed is a question of constitutional fact. *See State v. Samuel*, 2002 WI 34, ¶ 15, 252 Wis. 2d 26, 643 N.W.2d 423. In reviewing questions of constitutional fact, we will uphold a circuit court's factual findings unless they are clearly erroneous, but we will independently decide whether those facts meet the constitutional standard. *Id.*

¶ 9. Both parties evaluate the reasonableness of the stop within the framework of a community caretaker analysis. The community caretaker function was first described by the United States Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973):

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Police may, in certain circumstances, conduct a seizure within the meaning of the Fourth Amendment without probable cause or reasonable suspicion provided that the seizure based on the community caretaker function

is reasonable. *See State v. Anderson*, 142 Wis. 2d 162, 167, 417 N.W.2d 411 (Ct. App. 1987). The State bears the burden of proving that an officer's conduct fell within the scope of a reasonable caretaker function. *Kramer*, 2009 WI 14, ¶ 17.

¶ 10.  In *Anderson*, we developed a three-part test to evaluate the reasonableness of a seizure by police made in the course of their community caretaker function. We held:

> [W]hen a community caretaker function is asserted as justification for the seizure of a person, the trial court must determine: (1) that a seizure within the meaning of the fourth amendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual.

*Anderson,* 142 Wis. 2d at 169. We therefore apply the *Anderson* test to the facts of this case.

1.   Anderson *Steps One and Two: The Seizure Requirement and the Nature of the Officer's Conduct*

¶ 11.   The parties do not dispute that the seizure requirement has been met and the first step satisfied. Turning to the second step, we are required to determine whether the police conduct was bona fide community caretaker activity. In applying this second requirement, a court considers whether police conduct is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Kramer*, 2009 WI 14, ¶ 23 (citing *Cady*, 413 U.S. at 441). Truax argues that because Hansen conceded that part of his patrol duties con-

sisted of detecting and investigating intoxicated driving, his conduct was not divorced from the detection of a crime and did not meet the second requirement.[2]

¶ 12.  Truax's argument was recently addressed by the supreme court in *Kramer*. In *Kramer*, the officer stopped to check on a vehicle legally parked on the side of a county highway at 8:45 p.m. *Kramer*, 2009 WI 14, ¶¶ 4–5. It was dark outside and the vehicle's hazard lights were activated. *Id.*, ¶ 4. The officer testified that his reason for stopping was to offer assistance, however, when he approached the vehicle, he shined a flashlight through the rear window of the vehicle and placed his hand on his holstered gun. *Id.*, ¶¶ 5–6. When asked whether he was concerned that a crime might be taking place, he responded that it was on his mind and always is when he approaches an unknown situation. *See id.*, ¶ 6.

¶ 13.  In addressing whether evidence of an officer's subjective belief that criminal activity might be taking place operates to preclude conduct from falling within the scope of the community caretaker function, the court clarified:

> [T]he 'totally divorced' language from *Cady* does not mean that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function. Rather . . . in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns.

---

[2] The trial court agreed that Hansen's seizure of Truax's vehicle was unreasonable because there was no objective evidence necessitating Hansen to engage in a community caretaker function.

*Kramer*, 2009 WI 14, ¶ 30. Here, under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown—the facts establish that Hansen was engaged in bona fide community caretaker conduct when he approached Truax's vehicle.

¶ 14.   First, Hansen did not testify to any belief that criminal activity was afoot when he approached Truax's vehicle. He had not observed any violations of the law or other driving which would typically arouse suspicion as to intoxication. Hansen observed Truax's vehicle make an abrupt exit from the roadway and testified to his belief that the driver may be experiencing mechanical or medical difficulties. Hansen testified that it would be unusual for a vehicle to pull over upon seeing a marked police car, and therefore, he believed it was possible that Truax was actually hoping to gain his attention.

¶ 15.   Despite Hansen's testimony that patrolling for intoxicated drivers is part of his routine duty, we conclude that Hansen was engaged in bona fide community caretaker activity at the time he approached Truax's vehicle. In doing so we recognize the "multifaceted" nature of a police officer's work and the reality that an officer approaching a situation cannot always be sure whether the encounter will necessitate law enforcement or community caretaker activity. *Id.*, ¶ 32.

¶ 16.   We reject Truax's reliance on the facts and circumstances of *Kramer* to challenge Hansen's conduct in this case. Specifically, Truax cites to the driver's use of hazard lights in *Kramer* and the fact that the officer did not observe the driver leave the roadway and, therefore, had no idea how long the driver had been on the side of the road. While those facts are different, they are no more compelling. Truax's abrupt departure from

the roadway prompted Hansen's concern as to whether Truax's vehicle had experienced a mechanical problem or whether Truax himself had suffered from a medical condition. Therefore, the underlying concern for the driver's well being—the justification for community caretaker activity—is the same. Hansen's conduct satisfies the second step under the *Anderson* test.

2. Anderson *Step Three: Balancing the Public's Need and Interest Against Individual Privacy*

██

¶ 17. Finally, we turn to the third step, which requires us to determine whether the public need and interest outweigh the intrusion upon the privacy of the individual. *See Anderson*, 142 Wis. 2d at 169. In applying this balancing test, we consider these factors: (1) the degree of public interest and the exigency of the situation; (2) the circumstances surrounding the seizure—time, location, and the degree of overt authority displayed; (3) whether an automobile was involved; and (4) the availability of alternatives to the type of intrusion that actually occurred. *Id.* at 169–70.

¶ 18. As noted in *Kramer*, the public has a substantial interest in police offering assistance to motorists who may need assistance, especially after dark and in less urban areas. *Kramer*, 2009 WI 14, ¶ 42. It was after midnight when Hansen noticed Truax's vehicle, therefore, it was after dark and at a time of night when people would be less likely to stop and offer assistance. While the area was directly across from the banquet hall and, thus, assistance may have been nearby, it was Hansen's belief that Truax might be suffering from a medical condition and therefore might not have been able to obtain help. The public interest in police attend-

ing to persons who may need roadside assistance and the potential exigency of any medical concern lead us to view the first factor in favor of reasonableness.

¶ 19. With respect to the second factor, the circumstances surrounding the seizure, we have already noted that it was after midnight and the location was across the street from a banquet hall but on the unpaved shoulder of a road. Truax's position on the shoulder of the road, after dark, increased the need for safety precautions. Had Truax been pulling over to use his phone or get his bearings, one could reasonably expect that he would instead pull into the banquet hall parking lot.[3] The degree of authority displayed by Hansen while approaching Truax was minimal. Like the officer in *Kramer*, Hansen pulled up behind an already stopped vehicle, activated his emergency lights to signal passing traffic as to the presence of vehicles on the shoulder, and simply asked whether the driver needed assistance. *See id.*, ¶¶ 7, 43.

¶ 20. The circumstances surrounding the seizure support the conclusion that Hansen reasonably performed his community caretaking function under both the second factor and the third factor. The involvement of an automobile—a consideration under the third factor—does not impact the reasonableness of Hansen's actions. He simply approached the vehicle and asked if the driver needed assistance. *See id.*, ¶ 44.

¶ 21. With respect to the fourth and final factor to be considered in applying the third step under *Anderson*, we consider the feasibility and availability of alternatives. *Anderson*, 142 Wis. 2d at 169–70. It is

---

[3] In fact, when Hansen eventually performed field sobriety testing, he escorted Truax to the banquet parking lot so that they could be administered safely in a well-lit environment.

under this factor that Truax, and the trial court, took the strongest objection to Hansen's conduct. Truax argues that Hansen should have observed his vehicle for a longer period of time to determine whether the vehicle had problems or whether the driver was in distress. This argument was rejected in *Kramer* for good reason. *Kramer*, 2009 WI 14, ¶ 45. If the officer had left the vehicle and the driver had stopped abruptly for health reasons, it might have been too late for effective assistance at a later time. *See id.* Nor does it make sense for an officer to abandon a vehicle that may be experiencing mechanical difficulties, thereby risking the driver exiting the vehicle in the dark and walking along the roadway. *See id.* The alternatives suggested by Truax would have prevented Hansen from rendering effective aid under the community caretaker function had it been needed. The fourth factor favors a finding of reasonableness, and therefore, the third and final step of *Anderson* is satisfied.

## CONCLUSION

¶ 22.   We conclude Hansen was engaged in a bona fide community caretaker function at the time he approached Truax's vehicle, and that he reasonably performed this function under the totality of the circumstances presented. We therefore reverse the trial court's order granting Truax's motion to suppress evidence stemming from the stop of his vehicle. We remand with directions to reinstate the complaint.

*By the Court.*—Order reversed and cause remanded with directions.