COURT OF APPEALS
DECISION
DATED AND FILED

April 8, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2023AP99-CR**

Cir. Ct. No.  **2020CF305**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

ANDREW J. BRUNETTE,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Barron County: JAMES C. BABLER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Andrew Brunette appeals a judgment, entered upon a jury's verdict, convicting him of first-degree intentional homicide, contrary to

WIS. STAT. § 940.01(1)(a) (2023-24).[1]  Brunette argues that the circuit court erred by denying his pretrial motion to suppress statements he claims were involuntarily made to police during a custodial interview.  We reject Brunette's arguments and affirm the judgment.

## BACKGROUND

¶2      The State charged Brunette with first-degree intentional homicide, arising from the shooting death of Garrett Macone.  According to the complaint, Brunette's wife had moved out of the residence she shared with Brunette and their children and moved into Macone's mother's house to live with Macone.  On September 19, 2020, Brunette and his wife traveled to St. Paul, Minnesota, where one of their children was hospitalized.  At approximately 12:45 p.m. the following day, Macone's mother found Macone's body on the front patio of her Chetek, Wisconsin, home with what appeared to be two gunshot wounds to the back of his head.

¶3      At the request of the Barron County Sheriff's Department, a St. Paul police officer located and stopped Brunette's vehicle on the evening of September 20, 2020, as he and his wife were leaving the hospital to return to Wisconsin.  The officer asked about Brunette's arrival and departure times to and from the hospital.  Brunette stated that he was at the hospital overnight and that he left only briefly during the day to purchase food.  Brunette's parents, however, informed law enforcement that Brunette had stopped at their Rice Lake, Wisconsin,

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

home at approximately 9:20 a.m. that morning to pick up some clothes before returning to the hospital.

¶4    Brunette eventually left the hospital and drove his wife to Macone's home, which remained an active crime scene. During a recorded interview with two detectives in an unmarked truck at the scene, Brunette admitted driving back to Wisconsin that morning, but he denied any involvement in Macone's death. Brunette also spontaneously offered that although he did not know how Macone was killed, his only weapon with ammunition was recently stolen from him by a homeless man.

¶5    During the latter half of the interview, the officers encouraged Brunette to tell them what happened, adding that "[t]he longer this drags on, it's [going to] drastically affect your kids." The officers also repeatedly stated that if Brunette told the truth, they would do everything in their power to ensure that his children were not placed with his wife but, rather, with his parents. Brunette continued to insist he was not involved in Macone's murder.

¶6    At the end of the interview, Brunette was arrested, and during his transport to the police station, Brunette spontaneously told a third law enforcement officer: "You can tell them I'm ready to tell the truth," adding, "I just wanted to protect my family." At the outset of the first police station interview, Brunette apologized to the detectives for lying, emphasized that his actions were done to protect his family, and stated that he did not want to go away for life. One of the detectives responded: "You're not going to go away for life." When Brunette insisted, "I know I'm going away for the rest of my life," the detectives repeatedly stated, "No, you're not," and they encouraged him not to "talk like that."

¶7      Over the course of two **Mirandized**[2] interviews at the police station, Brunette admitted to shooting Macone in the back of the head while Macone was sleeping. Brunette explained that he dragged Macone's body outside with the intent to remove it from the scene, but he changed his mind. Brunette also told law enforcement where to find one of the shell casings, the gun, and clothing that would tie him to the crime.

¶8      Brunette subsequently filed two motions to suppress the following: (1) statements he made in the truck on the ground that police should have advised him of his **Miranda** rights; and (2) statements he made during the police station interviews on the ground that they were involuntarily given. After a three-part hearing, the circuit court denied the suppression motions. With respect to the truck interview, the court determined that **Miranda** warnings were unnecessary because the interview was noncustodial. The court also concluded that there were no coercive or improper police tactics utilized during the police station interviews, and even if there were, Brunette's statements were nevertheless voluntary.

¶9      The matter proceeded to trial, and a jury found Brunette guilty of the crime charged. The circuit court sentenced Brunette to life in prison with eligibility for extended supervision after fifty years. This appeal follows.

---

[2] *See* **Miranda v. Arizona**, 384 U.S. 436 (1966).

**DISCUSSION**

¶10 On appeal, Brunette argues that the circuit court erred by denying his motion to suppress statements made during the police station interviews.[3] When determining whether a defendant's custodial statement may be admitted into evidence, the State must show, by a preponderance of the evidence, that: (1) the defendant was informed of his or her ***Miranda*** rights, understood them, and knowingly and intelligently waived them; and (2) the defendant's statement was voluntary. ***State v. Santiago***, 206 Wis. 2d 3, 18-19, 556 N.W.2d 687 (1996). Here, it is undisputed that Brunette was in custody and that he was read and intelligently waived his ***Miranda*** rights before agreeing to speak during his two police station interviews. Therefore, the only issue on appeal is whether Brunette's statements were voluntary. Voluntariness is a question of constitutional fact. ***State v. Moats***, 156 Wis. 2d 74, 94, 457 N.W.2d 299 (1990). In reviewing questions of constitutional fact, we uphold a circuit court's factual findings unless clearly erroneous, but we independently determine whether those facts meet the constitutional standard. ***State v. Samuel***, 2002 WI 34, ¶15, 252 Wis. 2d 26, 643 N.W.2d 423.

¶11 Improper police conduct is a necessary prerequisite for finding a confession involuntary. ***Colorado v. Connelly***, 479 U.S. 157, 167 (1986). There must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." ***Id.*** at 165. Our supreme court has held that a defendant's statements are voluntary if they are "the product of

---

[3] In his brief, Brunette notes that only his statements during the police station interviews are at issue in this appeal. Because it appears Brunette is abandoning any claim that the circuit court erred by denying his motion to suppress statements he made in the truck, we need not address that claim. *See **State v. Johnson***, 184 Wis. 2d 324, 344-45, 516 N.W.2d 463 (Ct. App. 1994).

a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Hoppe*, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407. In determining whether Brunette's statements were voluntary, we consider the totality of the circumstances. *Id.*, ¶38. This test requires balancing the personal characteristics of the defendant against the pressures and tactics employed by law enforcement officers to induce the statement, which include

> the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.*, ¶39. However, absent coercion or improper police pressures, there is no need to engage in the balancing test between the defendant's personal characteristics and those nonexistent pressures. *State v. Vice*, 2021 WI 63, ¶31, 397 Wis. 2d 682, 961 N.W.2d 1.

¶12 In his suppression motion, Brunette argued that his statements were coerced because law enforcement falsely claimed they would "try to ensure" that his children remained with his parents rather than his wife, and they falsely promised that Brunette would not go to prison for life. Brunette further argued that his untreated mental illness, personal stress, and exhaustion left him unable to defend himself from the detectives' coercive tactics.

¶13 At the suppression motions hearing, video and audio recordings of the interviews were introduced. One of the interviewing detectives, Jason Hagen, testified that referencing Brunette's children was a way to develop rapport, which

is an interviewing technique. With respect to the detectives' assurances that Brunette was not going to prison for life, Hagen explained that Brunette was "quite emotional and was crying, sobbing," and the detectives "were just trying to get him to calm down so that [they] could continue the conversation."

¶14 Two experts also testified. The first, a clinical psychologist, opined that Brunette suffered from post-traumatic stress disorder, major depression with psychotic features, borderline personality disorder, and attention deficit hyperactivity disorder. The second expert, a psychology professor who studies coercion within police interrogations, noted that Brunette had been awake for approximately thirty hours when he was interviewed. The professor opined that Brunette's mental illness combined with his fatigue were risk factors making him "more susceptible to social influence."

¶15 In denying the suppression motions, the circuit court determined that the assurances the detectives gave to Brunette "were neither patently false nor necessarily incorrect." We agree. The detectives' vague offers to "try" to ensure that Brunette's children remained with his parents were not outright promises and did not induce a confession during his interview at the scene. Rather, it was not until his transport to the police station that Brunette stated he wanted to tell the detectives the truth.

¶16 With respect to the detectives repeatedly telling Brunette he was not going away for life, the record shows that, in context, these statements were made to calm Brunette when he was highly emotional. Further, as the circuit court recognized, Brunette asked to speak to the detectives prior to their assurances that he would not be sentenced to life in prison. Therefore, no promise of leniency was

made in exchange for Brunette's confession. Ultimately, we are not persuaded that the detectives' challenged statements were improperly coercive.

¶17 Even if we were to conclude that the detectives' tactics were improperly coercive, we are not persuaded that Brunette's statements were rendered involuntary. As the circuit court acknowledged, Brunette suffers from some mental health issues and had "probably been awake for up to 24 hours when interviewed." Based on its review of the video and audio recordings of the interviews, however, the court found that Brunette "was coherent" and "knew what he was doing." The court added that all of the interrogations were "low-key, slow-paced…. [e]xtremely friendly," and "totally conversational" with "significant pauses, especially in the first interview."

¶18 In further concluding that Brunette's statements to police were the product of his choice, the circuit court also emphasized that Brunette told the detectives, "I just wanted to know if you guys had any questions. I just want to answer as many as I could." The court concluded:

> After having heard all of that, it is abundantly clear to this [c]ourt that the defendant's statements to the detectives at the scene, although they are exculpatory, and those given in the squad car and then at the [s]heriff's [d]epartment were the product of a free and unconstrained will reflecting the deliberateness of choice. He made choices in the first interview to give denials and alibis, but he made the other choice later on.

¶19 Under the totality of the circumstances, we agree that the detectives' challenged statements were not so fundamentally coercive as to overpower Brunette's will. Therefore, the circuit court properly denied his suppression motion.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.